ST. LOUIS SOUTHWESTERN RAILWAY COMPANY *v.* LEFLAR.

Opinion delivered July 15, 1912.

1. CARRIERS—INJURY TO PASSENGER—PRESUMPTION.—Proof that a car was derailed and a passenger injured makes a *prima facie* case of negligence against the carrier, which is bound to exercise the highest degree of practicable care consistent with operation of its road in the inspection and equipment of its cars. (Paage 534.)

2. SAME—NEGLIGENCE—SUFFICIENCY OF EVIDENCE.—A verdict holding that a railway company was negligent in failing to discover a defect in an equalizer which caused the derailment of a coach and the injury of a passenger was sustained by proof tending to prove that there was a defect in the equalizer which could have been discovered upon reasonably careful inspection. (Page 534.)

3. INSTRUCTIONS—REPETITION.—The refusal to give a correct instruction asked upon a certain issue was not prejudicial where in other instructions given the court clearly defined the law upon such issue. (Page 535.)

4. APPEAL AND ERROR—INVITED ERROR.—Appellant can not complain of an argument by appellee's attorney which was provoked by the improper conduct of appellant's attorney. (Page 536.)

5. TRIAL—IMPROPER ARGUMENT.—In a personal injury suit where the evidence tended to prove that plaintiff was permanently crippled, a reference in the argument of his attorney to the fact that he would be compelled to drag himself in a crippled condition around his wife and baby was not improper. (Page 537.)

6.   DAMAGES—EXCESSIVENESS—PERSONAL  INJURIES.—Plaintiff, who is
a travelling salesman 31 years of age, recovered $5,250 for injury to
his knee received in a railroad wreck.  He was in the hospital for a
week, was unable to work for six weeks or to walk without crutches,
and was under a physician's treatment for ten months.  He is unable
to walk without a stick, and his knee pains him at night and during
cloudy weather.  The physician testified that his injuries are permanent
*Held* that the recovery was not excessive.  (Page 537.)

Appeal from Dallas Circuit Court; *Henry W. Wells,*
Judge; affirmed.

*S. H. West* and *Bridges & Wooldridge,* for appellant.

1.   The rule with reference to the skill, diligence and
foresight which a railway company must employ to provide
for its passengers a reasonably safe track and equipment and
to maintain them in a reasonably safe condition does not
go to the length of requiring it to anticipate every possible
accident.   52 Ark. 517-524.

A carrier of passengers is not an insurer of their safety.
57 Ark. 418, 422.

2.   If it be conceded that there was a defect in the equal-
izer bar, the testimony entirely fails to show that it could have
been discovered, even by the most careful inspection.   A jury
is not warranted in assuming that a defect could have been
discovered from the mere fact that it existed.   138 Mass.
426; 159 Mass. 313; 34 N. E.  461; 54 N. E. (Mass.) 842.

3.   The argument of appellee's attorney was prejudicial
from beginning to end, and the cause should be reversed on
that account, notwithstanding his disclaimers, when specific
objections were made.   The argument was of such a nature
that the prejudicial effect could not be removed by any
so-called withdrawal of remarks and enforced disclaimers.   The
spoken words can not be recalled.

*H. K. Toney, Jeff Davis* and *Frank Pace,* for appellee.

1.   The verdict of the jury must be taken as conclusive
that there was a defect in the equalizer bar which could have
been discovered upon a proper inspection.   92 Ark. 357; 82
Ark. 372, 375; 138 Mass. 426.

3.   The law with reference to the care that should have
been exercised by defendant in inspecting its cars was correctly

given in several instructions, amongst others being instruction 4, and there was no error in modifying instruction 3 requested by appellant.

3.    There was no prejudice in the argument of appellee's attorney.    Before a case will be reversed on account of remarks of counsel in argument, it must appear that they were improper; that they are prejudicial; that the attempt of counsel to remove any prejudice they might have caused was in vain, and that they influenced the jury in arriving at their verdict. 89 Ark. 92; 48 Ark. 123; 90 Ark. 406; 73 Ark. 73; 71 Ark. 435; 82 Ark. 64.

4.    The verdict was not excessive.    94 Ark. 254; *Id.* 270; 86 Ark. 87; 75 Ark. 579; 56 Ark. 595; 95 Ark. 311; 81 Ark. 187; 31 Pac. 411; 62 Hun 620.

Kirby, J.    Appellee brought this suit for damages for personal injuries alleged to have been caused by the derailment of appellant's train, upon which he was a passenger.

As the train came into Brinkley, an "equalizer" on one of the cars broke, dropped down and dragged along until it struck a switch rail and prized and opened it to such an extent as to cause the derailment of four coaches, which turned over.    Appellee was a passenger in one of these coaches, and, when the car began to jolt, grabbed the back of the seat, and, as he did so, the car turned over, throwing him against the side and top of it and injuring his knee.    He assisted in getting the other passengers out of the cars, and did not think he was hurt much at the time.    After getting out, he sat on a pile of crossties for a few minutes, and then walked to the hotel.    His knee was paining and stinging him at the time, but he did not think the injury would amount to anything.    He walked to the hotel after going to Pine Bluff that evening, and his knee was getting stiffer all the time.    He was unable to get out of bed next morning, his knee was swollen, and he was suffering. He was in the hospital a week, compelled to walk on crutches six or seven weeks, and still used a cane in walking at the time of the trial.

The doctor testified that the injury was probably permanent, and that the injured knee would be more or less stiff throughout his life.

The equalizer is a bar of iron about four inches square,

extended on the six wheel trucks, the use of it being to equalize the weight of the car between the three sets of axles or journals of the trucks upon which it rested.

It was admitted that the engine and track were not defective.

P. M. Kilroy, general foreman of appellant's car department since July, 1901, with the title of "car builder," was on the train when it wrecked. He endeavored to locate the cause of the wreck, and said: "In looking I noticed what we call an open switch or crooked switch, and knew that was the cause. I went back and looked at it, and back of this particular switch, possibly thirty feet, or the first rail joint back of that, I noticed some little marks on the bolts that hold the joints, that attracted my attention, because it looked like something had been hitting. I went back to the switch and found slivers which had been torn off of some piece of metal, and we went along the train until we came to the first car that was derailed and found a broken equalizer, and found the part that had gone in between the switch that was torn off; the equalizer was broken off, and went over the stock rail, and allowed the wheels of this particular car to go on the inside. Q. What would be the effect of that equalizer dropping down and going between the two rails, as you described? A. The effect would be to cause the derailment; it couldn't be otherwise; something had to give, on account of that large piece of metal going in there."

He stated further that it was a standard equalizer, put on all classes of cars built with the style of trucks under that particular car, and that it was of the highest class manufactured at this time. That it was not considered possible to get any better trucks than was under the car, car 208.

"Q. What did you find when you inspected that coach, as to the equalizer bar that was broken? A. I found it had a crack from the bottom and quite a ways up. Q. Was that a fresh break? A. The top part was, but the bottom was not."

Witness then produced a blue print and explained the break of the equalizer, saying: "The break was hidden behind the oil box and pedestal, on the cracked end on the east side. The old break started from the bottom, and could not have

been seen by an ordinary inspection. It could have been discovered by an acute inspection, if an inspector had been advised to go and look for such a break. The only time it could have been discovered was when the trucks were rigged. The equalizer was made of good iron, and its age and that of the car was about eighteen months. The ordinary life of such coach, if nothing was done to it, would be twenty years. The coaches were inspected at Waco and Tyler, Texas, Texarkana and Pine Bluff, Arkansas, and Memphis, Tennessee. An inspection was made at each of these points on each trip made by the coach. The equalizer at the point of breakage was three by three, and at the top of the box it was three by three and a quarter, and at the bottom where the load was centered it was two by six. The old break of the equalizer began at the bottom. It was black, and showed it was not a fresh break. The crack may have been half way. Could not say that the break was on the face of the metal, nor how long it had been there. The end of the iron had been dragging, but it was very distinct on top that it was a new break. It may have been cracked three weeks or more. That part of the equalizer was behind the pedestal. The equalizer bends and goes over the oil box where it turns."

James Ray, a stationary engineer, who had worked for the Cotton Belt, as a car inspector, from 1899 to 1902, saw the wreck and the broken equalizer, which showed that there was an old crack on the bottom of it extending about half way through. The bottom part was blackened, and the other part was a fresh break, and answered further, as follows:

"Did you notice the place where that break occurred? A. Yes, sir; I was there at the time, and have seen it since. Q. I will ask you to state to the jury whether or not that portion of the equalizer where the break occurred is exposed, so a man can look at it when it is fastened in the car? A. Yes, sir; the location of the equalizer where the break occurred can be seen. Q. Isn't it behind the pedestal? A. No, sir. Q. It is open and exposed? A. Yes, sir."

He said on cross examination that he didn't know whether the crack was open and showed on the outside; that if it didn't show on the outside the inspector couldn't see it.

"Q. But in this instance, where the old break extended

half-way up on the side of the equalizer, and if this was exposed and an open crack, there would be no reason why the inspector would not see it? A. No, sir. Q. Did you show Mr. Oscar Parnell the place where that occurred on the car this afternoon? A. Yes, sir; showed him the place on the bar where it had been broken.

Parnell testified that he had been a car inspector for appellant company for six years; that witness Ray pointed out to him the location of the break in the equalizer on the car, and further:

"Q. I will ask you to state to the jury whether or not that was in plain view so that a car inspector could see the break at that place? A. Yes, sir. Q. I will ask you to state whether or not if, at the place where he pointed out, there was a break in the equalizer that extended about half-way up from the bottom, an old break, if a car inspector, making a reasonable inspection, could have seen it? A. Yes, sir. Q. And should have done so? A. Yes, sir. Q. Suppose it didn't show on the outside? A. They were telling me it showed on the outside. Q. Suppose a crack was so close together that it couldn't be discovered by an ordinary inspection, could you have seen it? A. Not if it was so close. Q. Could there have been a crack there, so it couldn't have been seen by an ordinary inspection? A. Any piece of iron of that size that is cracked enough to make up an inch on the outside would have been enough to have been seen. A. How do you know? A. By using it so much. If it was broke all the way across, it would have to show on the outside. Q. Couldn't the crack be inside, and show an old break, without showing on the outside? A. Not as much as they told me this was broken; they showed me how far it was broken."

Appellee testified that he saw the equalizer after the wreck, and that the old crack or break extended from the bottom of it about half-way up. As he remembered it, it was cracked all the way through from the bottom on both sides, and the lines were distinctly marked where the old break ended and the fresh break began. It was very perceptible.

Appellant's witnesses, from the car builder down, testified that the car was properly constructed out of standard materials, and was a first-class car, and that it was inspected by five

different inspectors ten times on each trip from Memphis to Texas and return, the inspection including the examination of the trucks and equalizers at each place, and that no defect had been discovered. All the witnesses agreed that there was an old break or crack in the equalizer before it finally broke in two, extending from the bottom about half-way through it, and two of them testified that a reasonably close inspection would have discovered the defect and break. It was near the oil box, and probably to some extent covered by the dust and grease, which may have accounted for the inspectors not discovering it.

Be that as it may, the defective equalizer caused the derailment of the train by which appellee, a passenger, was injured. The fact of the derailment and wreck makes a *prima facie* case of negligence against the appellant, which is bound, as a carrier of passengers, to the highest degree of practicable care, consistent with the operation of its road in the inspection and equipment of its cars. *Railway Co.* v. *Mitchell*, 57 Ark. 418.

The preponderance of the testimony indicates that the proper degree of care was used in the selection of material for and the construction and equipment of the car that caused the wreck and the inspection of it while in use; that the defect was not discoverable by such an inspection as the law requires the railroad to make of such equipment, but it was shown that the break was old, and had existed for some time and during many inspections, by the testimony of two witnesses qualified to testify about the matter; that it extended half way through the bar of iron, and showed on each side thereof, was a discoverable defect, and should have been seen upon a reasonably careful inspection, and we can not say that the testimony is not sufficient to support the verdict.

In the case of *St. Louis & S. F. Rd. Co* v. *Wells*, 82 Ark. 374, the court said: "The testimony of some of the witnesses shows that the break or crack in the bar was an old one; that it was about an inch and a fourth deep across the bottom of the bar, and was scaly, blackened and rusty from exposure, and had the appearance of having been done some time before. If this testimony is true, the flaw must have been in the bar when it was inspected, and one of the witnesses introduced by the

defendant testified that such a flaw could have been detected by a careful inspection. We think this was sufficient to justify a finding by the jury that there was an observable defect in the bar, and that the defendant failed to exercise due care to discover it. * * * The question we have to determine is, not whether the verdict is in accordance with the weight of the evidence, but whether there is evidence of a substantial character to support it. If there was such evidence, it is not our province to determine its weight, as that was for the jury."

This is also a stronger case for recovery than was that of *St. Louis, I. M. & S. Ry. Co.* v. *Reed,* 92 Ark. 357, which was an action for damages for injury to an employee, as was the case of *St. Louis & S. F. Rd. Co.* v. *Wells, supra,* where the law does not require so high a degree of care of the railway company as is required of it for the protection and safety of its passengers, which latter rule is correctly laid down in *Railway* v. *Mitchell, supra.*

It is contended next that the court erred in its refusal to give, as requested, appellant's instruction numbered 3, and in striking therefrom the words "nor that the inspecting of coach No. 208 was perfect," in parenthesis below said instruction, after correctly defining the degree of care required to be exercised by the railroad, as same was defined in instruction numbered 4, given for appellant, concluded:

"The company is not an insurer of the safety of its passengers, (not that the inspecting of coach No. 208 was perfect). It was only required to exercise that degree of care as above set forth in having its said coach properly inspected by competent inspectors; and if it did this and plaintiff was injured, it would not be liable, and your verdict should be for the defendant."

The court did not err in striking out said expression, although it could have been given, as requested, without error committed. As already said, the instruction defined the degree of care required of the company, and it also gave for appellant instruction No. 4, a part of which is as follows:

"If you believe from the evidence in the present case that the defendant used the highest degree of care which a prudent and cautious man would have exercised under the

circumstances, and which was reasonably consistent with the practicable operation of its road, in inspecting coach No. 208, and in maintaining the same, the defendant discharged its duty toward the plaintiff, and is not liable for his injuries, even though the coach or car in which plaintiff was riding was derailed, and he was injured thereby."

The instructions given clearly defined the degree of care required of the railway company, in the maintenance and inspection of the car, without including the phrase stricken out, and the court did not err in striking it from said instruction No. 3, and appellant was in no wise prejudiced thereby.

The next objection is to the alleged improper argument by appellant's attorney; the whole of the argument of his counsel being set out in the brief and then objected to and specific objections and exceptions made to the following:    "I remember upon the Iron Mountain or Cotton Belt up here at Paragould a man deliberately kicked another man off the train and killed him."

Appellant's attorney: "Your Honor, I object to that statement; it wasn't the Cotton Belt."

Appellee's attorney: "I am making the point that, if they knew the defect was there and didn't fix it, it would be criminal negligence.  Gentlemen of the jury, don't pay any attention to that."

A remark about the transfer of the cause to the Federal court by appellant was objected to, and finally the following:

"That boy is a cripple; he has a crippled leg; one that he will have to carry around unto his grave; how much ought he to be paid, dragging a crippled, maimed limb with him? He has got to cripple up to that baby of his and drag himself around his wife in this condition."

After the objection, the attorney disclaimed any intention of asking for damages for the anguish of mind of the wife and child, but only for that of the injured man.

The argument about the removal of the cause to the Federal court was provoked by the conduct of appellant's attorney in stating the history of the suits brought for the injury and the dismissal of one from the Federal court; and, even if it was improper, it was invited under the circumstances, and appellant can not complain of it.

The first remark, as to one man kicking another from a train of either the Iron Mountain or the Cotton Belt railroad, was not finished, and, the statement being made by appellant's attorney that it did not occur upon his road, the attorney admonished the jury to pay no attention to it. And, as for the other remarks, that the injured man would be compelled throughout his life to come crippled into the presence of his wife and baby, we do not see that it was an improper argument. If he was permanently injured in his knee, as the evidence tended strongly to show, we see no reason why the disfigurement and humiliation that one crippled naturally feels in the presence of others not so afflicted, and especially in the presence of those dependent upon him, would not be a proper argument to show the suffering arising from the injuries inflicted.

The practice of making questionable arguments is to be condemned; but, as said already, we do not find from the remarks objected to that any prejudice resulted to appellant on that account, the attorney, at the time, having admonished the jury to disregard the one, his incomplete statement, and directed their attention to the sole purpose, a proper one, for which the other was made.

The last contention is that the verdict is excessive. Appellee, a traveling salesman, thirty-one years of age, was injured in his right knee in January, was in the hospital one week, unable to work for six weeks longer, or to walk without crutches, and under treatment of a physician until November following. The physician testified that the injury was permanent, and that the knee would be more or less stiff throughout his life. He is unable to walk without a stick, except upon clear days, and the knee continues to pain him, the pains being severe at night, and especially during changes of the weather. It is true, no decrease of his earning capacity is shown, but, for the pain and suffering, loss of time, inconvenience and humiliation of walking and getting about during the remainder of his life, a cripple, with a stiff knee and leg, we can not say that the sum awarded by the jury as damages for the injury is excessive.

Finding no prejudicial error in the record, the judgment is affirmed.