## ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.* MCMICHAEL.

### Opinion delivered October 19, 1914.

1. EVIDENCE—CROSS-EXAMINATION—CREDIBILITY.—The extent to which a cross-examination should go on collateral facts is within the discretion of the trial judge, and it is not not a matter for reversal unless it plainly appears that the discretion has been abused to the prejudice of the party objecting, and cross-examination of defendant's witnesses in a personal injury action, *held* proper when the witnesses were asked if they had not testified as expert witnesses for the defendant in other cases.

2. EVIDENCE—PERSONAL INJURIES—EXPERIMENTS—SIMILAR CONDITIONS.— Experiments made after the occurrence of an injury, to test the accuracy of the testimony of witnesses to the occurrence, must be made under conditions that are substantially or essentially the same as were the conditions at the time of the occurrence in order to render evidence of such experiments competent.

3. TRIAL—ARGUMENT OF COUNSEL—OPINION.—In an action for damages for personal injuries, caused by the alleged negligence of a railway locomotive engineer, a statement by plaintiff's counsel that he believed "that the old engineer was blind" was merely an expression of counsel's opinion, and was not improper.

4. RAILROADS—INJURY TO PERSON ON TRACK—LOOKOUT.—In order that a railroad company may be held liable for injuries to a person on its track, the jury must find that the railroad's employees, by exercising ordinary care, saw or could have seen that plaintiff was in a perilous position, in time to have avoided injuring him.

5. DAMAGES—PERSONAL INJURIES—ELEMENTS.—The measure of damages, in an action for damages, against a railroad company for injuries due to negligence, is what the jury may find from the evidence to be a fair and just compensation with reference to the pecuniary and other losses which plaintiff has sustained by reason of his injuries, in determining which the jury may consider his age, health, habits, occupation, expectation of life, mental and physical capacity for and disposition to labor, personal expenses for treatment, rate of wages, earning power and probable increase or diminution of that power with the lapse of time, pain and suffering which he has endured and shall continue to endure, and mental anguish on account of the disfigurement of his person.

6. NEGLIGENCE—QUESTION FOR JURY.—Evidence in an action for damages due to negligence, *held* sufficient to sustain a verdict in favor of plaintiff.

7.    DAMAGES—PERSONAL INJURIES—QUESTION FOR JURY—DUTY OF COURT.·
—It is the province of the jury to determine from the evidence
what damages plaintiff should receive by way of compensation,
when injured by defendant's negligence, but in reviewing the
judgment, the court may say whether this amount exceeds the
bounds of reasonable compensation as the law prescribes.

Appeal from Independence Circuit Court; *R. E. Jeffery,* Judge; modified and affirmed.

STATEMENT BY THE COURT.

Appellee sued the appellant for personal injuries. He alleged, in part, as follows: That on the 18th day of March, 1913, he was at George's Spur, a station on defendant's railroad, for the purpose of boarding one of defendant's trains due at that station near 12 o'clock, noon, going east, and that defendant's servants and employees operating said train ran same over him, cutting off his legs below the knees and otherwise injuring and damaging him, by reason whereof he was permanently disabled, disfigured and injured; that he was caused to suffer great mental and physical pain, loss of time; had been compelled to hire physicians and surgeons and buy medicines, and will be compelled in the future to suffer mental and physical pain and loss of time, hire physicians and surgeons and buy medicines, all to his damage in the sum of $75,000; that the plaintiff's injuries and damages were caused by the carelessness and negligence of the defendant's servant and employees operating the train aforesaid in their failure to keep a constant lookout for persons upon the track, or to avoid injuring him after discovering his dangerous position; that if such lookout had been kept they could have discovered plaintiff's peril and could have prevented injuring him by the exercise of ordinary care, etc.

The answer of the defendant denied the allegations of negligence and damages, and set up the defense of contributory negligence and assumed risk.

The testimony of the plaintiff tended to show that at the time he was hurt he was twenty-eight years old. He

was injured at George's Spur, a station on defendant's road, on the 18th of March, 1913. At the time he was injured he was in the employ of the Southwestern Telegraph & Telephone Company as foreman of the construction department, and his work was that of general repair of the lines. He had been in the employ of the company ten or twelve years, and had been working in the capacity of foreman four or five years. Had been working under the directions of one Mr. Burke, who was district plant chief. On the day before the injury he had done a hard day's work, and on that night went to Augusta, from which place he expected to go to do some work the next day near George's Spur. The night of the day before his injury he got only about two hours sleep. He went to work early the next morning. He left his work at noon, went to George's Spur, a flag station on defendant's road, for the purpose of boarding a train to Augusta to get his dinner. There was nothing at George's Spur but a little platform 8x10. He was expecting to take defendant's train from Little Rock to Memphis, which ordinarily passed the Spur at about 12:30. He was sitting on the platform, about two or two and a half feet from the track, with his feet on the ends of the ties eight or ten inches from the rail. He was tired, sleepy and worn out, and dropped off to sleep, leaning over toward the track with his face in his hands (he indicated the position to the jury). The next thing he knew was the next morning, about 7 o'clock, when they carried him into the operating room at Little Rock. He could just remember going into the operating room, and passed away; didn't remember anything until the next evening about 5:30; then he passed off again and didn't remember anything until three or four days afterward. He felt the lick on the right side of his head when he was hit, but didn't know what it was. When he became conscious there was a big scar down his face and a big scar on his right arm and both his legs were off. When he finally became conscious of what had occurred to him he had the headache. His legs and his arm and shoulder hurt him.

His right arm felt like it was dead. There was a second operation on the left leg four weeks after the first operation; then there was another operation on both legs. He suffered greatly in the hospital and after they brought him to his home at Newport; his legs ached all the time, necessitating his having medical attention. A doctor at Newport operated on him again—opened up his leg and took out four or five bones. He himself cut out little pieces of bone that were working out of the flesh of his limbs which the doctor didn't take out.

He testified that his limbs hurt him all the time, aching and burning. Some nights he could not rest; was nervous; would wake up. Sometimes he would attempt to get off the bed and think that he had both feet and nearly fall off the side of the bed. His feet hurt something like there was a hurting in the bottom of his foot. His method of locomotion was a rolling chair. He didn't go to town often; he felt like people were looking at him. Before he was injured he had been under his chief, Mr. Burke, about three and a half years, and had taken vacation during that time amounting to about four days. He was getting $65 a month and his expenses. He had paid out $175 for medicines and medical attention.

The track approaching George's Spur from Bald Knob, in the direction from which the train came, was perfectly straight for a distance of six or eight miles. There was nothing that could have obstructed the view of the track there. The train was coming from the west and going east.

Witness Burke testified that he was in the employ of the Southwestern Telegraph & Telephone Company, as district plant chief. McMichael worked under him. With reference to industry, his character was the best that a man could have in every respect; he was sober, and was competent in every line of his work, and was in line of promotion. If he had been promoted he would run up just as high as he worked himself up to be; up as high as superintendent if he could do that. Witness's position was next to that of superintendent. If McMichael got a

job as foreman he was in line of promotion for witness's position. Witness's position paid $115 and expenses per month, which was gradually increased each year to $150.

McMichael's wages were to have been raised in the near future to $70 per month, if witness's recommendation went through.

Other witnesses testified to the same effect as to McMichael's character for industry and sobriety.

The engineer who was on the train that injured McMichael testified that he had been a locomotive engineer for over thirty years. When approaching George's Spur on the day of the injury at the usual distance, he sounded the station whistle. He got no signal to stop. There was no one on the platform and no one in sight to signal the train to stop. Consequently he did not slacken the speed of the train. On approaching the station at George's Spur he noticed an object which resembled something like a sack at a distance and looked like feed or something on the platform. He never took his eyes off it. When he got within 450 feet of the object he saw that it was a man; it was a man who was in a sitting posture, with his head down so low that you couldn't distinguish it as a human being on the platform. As soon as he saw that it was a man he shut off steam, applied the brakes in emergency, pulled the whistle, opened his sand and did everything that could be done to stop; that, seeing and realizing that it was a man in a dangerous place, he gave a continuous blast of the whistle. The man never moved as long as he was in the engineer's vision. The train consisted of five cars. The engine and baggage car ran by him, and the front end of the first coach stopped at McMichael.

The witness demonstrated before the jury the position in which he saw McMichael on the platform. He was sitting about the middle of the platform, with his feet down straight, not on the rail, but down by the ties. His head was bowed down on his knees, just as low as it could be, so that you couldn't see his head at all. At about seven or eight hundred feet he saw an object there which looked like a sack, like something like feed had been left

there on the platform. He ran past him about 130 feet. The track was straight from the Bald Knob end of the line for ten miles. He was running between thirty-five and thirty-eight miles an hour when he first saw the object. He was keeping a constant lookout, and could see from his side as well as the fireman could see from his side. Witness's eyesight was good, and it was a bright clear day. It was impossible for witness to stop the train in the space after he discovered that the object on the platform was a man. Witness, in his place on the engine, was about five feet above the track. McMichael was in such position that witness did not see his hands; he had them hid. The equipment of the train was in first-class working order. After discovering that the object was a man, witness stopped the train in about 580 feet. He had been running on that line something like three weeks when he struck McMichael. There was a slow board close to the Spur, with the word "Slow" on it, which is a sign to slow up for the drawbridge, but not to slow up at the point where the board was.

The testimony of the fireman tended to corroborate the engineer as to the position of McMichael and as to the efforts that were used to stop the train. The fireman stated that he noticed the object on the platform; that he was putting in coal between four and five hundred feet from George's Spur. The engineer sounded the alarm whistle. He finished his fire and then raised up probably a distance of 150 or 200 feet from the platform, when he noticed the object on the platform. He rang the bell and the engineer did everything he could with the whistle, but still the object didn't move. Everything was done that could be done to stop the train.

The testimony of the conductor, brakeman and other witnesses tended to corroborate the testimony of the engineer as to the efforts that were made to stop the train. A passenger on the train testified that it was an unusually sudden stop.

The appellant introduced the testimony of witnesses who made tests under substantially, if not precisely, sim-

ilar conditions to those existing on the day of the injury, on one occasion, with the same engine and the same number of cars, and, on another occasion, with an engine of same type, the same engineer, with a man placed on the platform in the same position in which McMichael was described as being in on the day of his injury. The train was running at practically the same rate of speed, and witnesses, who were not employees of the company, were placed in the cab on both the fireman's and the engineer's side who kept a constant lookout in the direction of the platform at George's Spur, and the place was marked from where they could first discover that the object was a man. These witnesses corroborated the testimony of the engineer, showing the distance at which it was first possible to discover that the object, occupying the identical position that McMichael was described as being in, was a human being, and also the distance in which it was possible to stop the train, using the same efforts as on the day of the injury.

Two of these witnesses were introduced as expert engineers, to show that the tests were made under precisely the same conditions that the train was being operated on the day of the injury, and to testify with reference to the distance at which and the time in which a train could be stopped under the conditions described.

On cross-examination, these witnesses were asked questions to the following purport: If they were not used frequently and principally as expert witnesses by the railway company, and they were asked particularly as to other cases in which they had testified, and whether they had not testified for other railroads in Arkansas? The witnesses answered the questions to the effect that they had been used frequently as experts, and that they had testified as such in various other cases and for other railroads in that capacity. The appellant objected to these questions, and the answers thereto. The court, in ruling upon the objections, stated: "This can only be considered, gentlemen, in arriving at what interest the witnesses might have in the case, if any."

Witness Neal, who was introduced to testify in regard to the test that was made which he witnessed, in his direct examination said, in answer to questions propounded by counsel for appellant, that he had occupied various official positions in Jackson County, towit, that he was first deputy sheriff two years, that he was elected circuit clerk and served four years, that he was then elected sheriff and served four years, and went out of office a year ago as sheriff. On cross examination, by counsel for the appellee, he was asked the following question: "Now, Mr. Neal, you told us about being an officer down yonder in Jackson County; you were defeated this last time, weren't you?" and answered, "Yes, sir." The appellant objected to the question and the answer, and the court overruled its objections, and appellant duly excepted.

In rebuttal, appellees, over the objection of appellant, introduced witnesses who made observations to ascertain how far a man could be seen sitting on the platform at George's Spur in the position appellee was in at the time of his injury. One of these witnesses testified as follows: "There was a man sitting upon the platform with his feet out toward the railroad. We went back toward Bald Knob to make the observation. We went 363 steps, or 1,089 feet, to the edge of the trestle. The man was sitting sort o' in this position (indicating), and when I was at this trestle I could see very distinctly that it was a man. I could even see his hands."

Another witness testified: "The man was sitting on the edge of the platform, facing the track, in about this position (indicating). We walked up as far as the trestle, 383 steps. I turned around to see if I could see anything on the platform. I could tell very readily that it was a man. I could see his hand."

Another testified: "The man was sitting on the edge of the platform facing the track, in about this position (indicating). We walked up as far as the trestle, 383 steps. I turned around to see if I could see anything on the platform. I could tell very readily that it

was a man. I could see his hand, that is, the hand next to me, very clearly.''

Another witness stated: ''I was there last Friday for the purpose of looking over the condition of that place. There was a gentleman sitting on the platform there in a stooping position. When we got to a point 1,-000 or 1,100 feet from the man on the platform, I could very readily distinguish the form of a man thereon. You could still see the man at a distance of between 2,000 and 2,206 feet, but not so plain as from the other end of the bridge.''

Another witness testified that he sat on the platform while they made the picture. He says: ''I got in the same position, supposed to be, that the man was that got hurt. I remained in an inclining position during the time the people were taking the observations from a distance up the track.''

Two of these witnesses testified that they had been passenger engineers for many years; that a person who had ridden on an engine for a number of years and who had become accustomed to the motion of the engine could see as well from the engine running at a speed of between thirty-five and forty miles an hour as he could if he was standing or walking on the ground. One of these witnesses testified that when one was on an engine ''he was in an elevated position and could see more clearly than a person down on the track. He could see an object in the distance plainer on the engine than he could walking.''

These last two witnesses, over the objection of appellant, also testified that a train going at the rate of thirty-five miles an hour could be stopped in an emergency in a space of between five and six hundred feet.

At the request of the plaintiff, the court gave the following instruction:

''2. If you believe from the preponderance of the evidence that the plaintiff was upon the tracks of the defendant, and in a perilous position, and that the agents and servants of the railroad company in charge of the train, whose duty it was to keep a lookout for persons and

property upon the track, saw the plaintiff in said perilous position in time to have avoided injuring him, by the exercise of ordinary care, or that said agents and servants of defendant, by keeping a constant lookout, could have seen the plaintiff upon the track and discovered his perilous position in time to have avoided injuring him by the exercise of ordinary care, and failed to exercise such ordinary care to protect the plaintiff from danger and injured him, then you will find for the plaintiff, and assess his damages at such a sum as you believe that he is entitled to under all the evidence in the case.''

Appellant duly objected to the granting of the above prayer on five specific grounds, and duly excepted to the ruling of the court in giving the prayer.

The court also gave the following instruction:

''3. If you find for the plaintiff you will assess his damages at such a sum that will compensate him for the bodily injury sustained, if any; the physical pain and mental anguish suffered and endured by him in the past, if any, by reason of the said injury; the effect of the injuries on his health according to the degree and probable duration of the same, if any; his loss of time, if any; and his pecuniary loss from his diminished capacity for earning money through life, if any; and the amount of money expended for medicine, and medical attention, if any; and from these, as proven from the evidence, assess such damages as will compensate him for the injuries received.''

The appellant objected to this instruction ''because it ignored the reduction to the present value the matters that are mentioned therein.''

The record shows that the court requested ''the attorneys for the defendant to offer any instruction that they might want given upon the matter of the sum that might be awarded to the plaintiff by reason of his inability to labor being reduced to its present value; whereupon the defendant states that it has already offered objection to the instruction upon the measure of damages requested by the plaintiff for the specific reason that the instruction

on the measure of damages ignores a reduction to a present value."

The appellant asked the court to instruct the jury as follows:

"1.   You are instructed that under the law and the evidence in this case your verdict will be for the defendant."

The court refused said prayer, and the appellant saved exceptions.

Appellant also presented the following prayer for instructions:

"15.   If you believe from the evidence in this case that defendant's employees kept a constant lookout as required by law, and after they discovered that the plaintiff was a human being, and that he was in a perilous position, used ordinary care to prevent the injury to him, then it would be your duty to find for the defendant."

The court also refused this request for instruction, and appellant saved exceptions.

The record shows that one of the attorneys for the plaintiff, in his closing argument, made the following remarks: "Talk to me about not being negligent; I think that old engineer (Mr. Hill) is blind, is really what I believe about it; if you want to know how I feel about it. Of course, he denies it. Said he was just wearing spectacles to cure the headache. You know that didn't have anything to do with that."

The jury returned a verdict for $35,000. Appellant filed a motion for a new trial, setting up various grounds reserved in its bill of exceptions to the rulings of the court, and, among others, that the verdict was excessive, and that the court erred in not directing a verdict in favor of the appellant. The motion for a new trial was overruled. Judgment was entered in favor of the plaintiff for $35,000, from which this appeal has been duly prosecuted.

*E. B. Kinsworthy,, S. D. Campbell, McCaleb & Reeder,* and *T. D. Crawford,* for appellant.

1.   The results of an experiment are incompetent as evidence unless all the essential conditions under which they were conducted were identical with those existing at the time of the accident.   112 Ill. App. 106; 113 *Id.* 547; 71 N. E. 922; 104 La. 104; 112 Pac. (Wash.) 752; 115 Ill. App. 101; 118 *Id.* 9; 88 S. W. 1087; 85 S. W. 1156; 35 Wash. 600; 123 Wis. 643; 2 Ga. App. 493; 9 Ind. App. 510; 132 Ind. 168; 108 S. W. (Tex.) 500; Gillett, Ind. & Coll. Ev., § 66; 216 Mo. 304; 21 Ore. 555; 128 Ala. 243; 110 Mass. 110; 84 Mich. 616; 15 L. R. A. 221; 154 Ill. App. 460; 38 L. R. A. 633; 115 N. Y. S. 590; 47 Ill. App. 292; 114 Ala. 587; 115 Ky. 13.

2.   Appellee's cross-examination of the engineers introduced as experts was improper.   It was intended solely to discredit these witnesses and to prejudice the jury against them.

3.   There was no evidence to justify counsel's statement in his closing argument to the effect that "that old engineer is blind," etc., and; when it was objected to, the court should have withdrawn it from the jury, instead of leaving it to the jury "to decide it."

4.   The court erred in giving instruction 2 to the jury and in refusing to give instruction 15, requested by appellant which correctly states the law.

5.   Instruction 3, given by the court, erred in that it entirely ignored the reduction to a present value of the matters set forth in it.   Under it, the jury might have inferred that they should multiply plaintiff's yearly earning capacity by his life expectancy, instead of reducing it to its present value.

6.   The court should have directed a verdict for the defendant.   The engineer's testimony that he was keeping a lookout, that he did not discover that the object on the platform was a human being until he was within four or five hundred feet of it, is perfectly reasonable, was not contradicted and could not arbitrarily be rejected.   101 Ark. 536; 53 Ark. 96; 67 Ark. 514; 80 Ark. 396.   It was not the duty of the engineer to slow up the train merely because he saw an object on the track.   59 Kan. 734; 92

Va. 553; 93 Va. 29; 63 L. R. A. 659; 69 Miss. 631; 75 So. 1132; 2 L. R. A. 498, and note; 47 Ark. 497; 36 Ark. 41.

·7. The verdict is excessive and is the result of passion and prejudice.

*Norwood & Grant, M. M. Stuckey* and *Frank Pace,* for appellee.

1. Appellee's attorney explained in the cross examination of the witness Williams that his object was to show the interest of the witness, and the court limited his answer, and that of the witness Homard, to that point only, which was a matter within the discretion of the court. 61 Ark. 52; 80 Ark. 201. It is proper to show the bias or prejudice of a witness toward a party litigant, as affecting his credibility. 80 Ark. 591. Moreover, appellant can not complain, because it introduced evidence of the same character in its cross examination of one of appellee's witnesses. 75 Ark. 251; 66 Ark. 292.

2. We concede that testimony as to experiments is incompetent unless the conditions under which they were conducted were substantially the same as those existing at the time of the accident; but the conditions in this case were practically or substantially the same.

3. There was no error committed in the argument that calls for reversal. When objection was made, counsel for appellee at once stated the argument was a deduction from the testimony, whereby the jury were advised that if it was not deducible from the testimony, they were not to consider it, and the court's direction left it to them to decide whether the argument was within the evidence or not. 39 Ark. Law Rep. 151; 103 Ark. 359; 93 Ark. 575; 91 Ark. 579; 76 Ark. 39; 74 Ark. 56; *Id.* 489; 79 Ark. 25; 82 Ark. 555; 91 Ark. 576; 103 Ark. 356.

4. Instruction 2 given by the court was correct, and instruction 15 requested by appellant was properly refused because the same point was covered in the instruction already given. 104 Ark. 528; 100 Ark. 437; 93 Ark. 58; 78 Ark. 520; 87 Ark. 602; 97 Ark. 405; 87 Ark. 308; 89 Ark. 326; 90 Ark. 19; 88 Ark. 12.

5.   Appellant refused to request an instruction upon the measure of damages, though given an opportunity so to do, but rested upon its objection to instruction 3 that it ignored the reduction to a present value of the matters mentioned in it.   Appellant is in no position to complain of error in that instruction.   77 Ark. 531; 69 Ark. 632; 75 Ark. 76; 67 Ark. 416; 75 Ark. 373; 77 Ark. 455.

6.   The court was right in not taking the case from the jury.   The jury has decided all the issues against the appellant, upon conflicting testimony.   And certainly, in the light of the testimony before them, the jury had the right to reject the testimony of the engineer to the effect that he failed to make out that the object on the track was a human being until he was within four or five hundred feet of it.   165 S. W. (Ark.) 951; *Id.* 949.

7.   The verdict was not excessive.   69 S. W. 653; 93 Ark. 564; 100 Ark. 437; 38 N. Y. St. Rep. 990; 53 App. Div. (N. Y.) 399; 106 Ill. App. 194; 42 N. W. 237; 57 S. W. 686; 84 S. W. 375; 114 N. W. 254; 109 N. W. 377; 142 S. W. 604; 120 Pac. 969; 69 S. W. 653; 80 S. W. 1073; 59 N. E. 1098.

Wood, J., (after stating the facts).   We will discuss the questions in the order in which they are presented in the brief of counsel for appellant.

(1)   There was no prejudicial error in permitting the counsel for appellee to ask certain witnesses, who had been introduced as expert engineers to testify with reference to the distance in which a train could be stopped, whether or not they had frequently been called by appellant and other railway companies to testify as experts. The court announced that this cross-examination would be allowed to show the interest of the witnesses.   It is manifest that the court permitted the cross-examination for the purpose of testing the credibility of the witnesses; and, in the mind of a reasonable man, no prejudicial inference could be drawn from the fact that the witnesses were frequently called by the appellant and other railroad companies to testify in the capacity of experts.   The questions were within the bounds of legitimate cross-ex-

amination. At least, it was within the sound discretion of the court to permit the questions to be asked and answered, and there was no abuse of the court's discretion.

The extent to which a cross-examination should go on collateral facts is largely within the discretion of the presiding judge, and is not a matter for reversal unless it plainly appears that the discretion has been abused to the prejudice of the party objecting. *St. Louis, I. M. & S. Ry. Co.* v. *Kelley,* 61 Ark. 52. .

The fact that expert witnesses were frequently called to testify in that capacity would certainly afford no reason for discrediting their testimony, and no reasonable mind could draw, on that account, an unfavorable inference against the party for whom they were called to testify.

(2) The testimony of the engineer and fireman on behalf of appellant tended to show that they were keeping a constant lookout, and that they did not discover that the appellee was a human being at a sufficient distance from where he was sitting on the platform near the appellant's railway track to have stopped the train in time to avoid injuring him; that they did everything within their power after discovering that appellee was a human being to stop the train and were unable to do so.

Appellant introduced witnesses who had made tests under essentially the same conditions, whose testimony tended to corroborate the testimony of the appellant's engineer and fireman. The testimony of these witnesses tended to show that it was between five and six hundred feet from where appellee was situated to where he could have been first discovered as a human being by those on an engine running at the speed of thirty-five or forty miles an hour.

It was shown on behalf of the appellant that it would take from 850 to 1,050 feet to stop a train going at a speed of thirty-five miles an hour on a level track and everything favorable.

Appellee, in rebuttal, over the objection of appellant, was permitted to introduce the testimony of witnesses to

the effect that they went upon the ground, and that at a point on the track considerably over one thousand feet from where appellee was sitting at the time of his injury, they could see a man sitting in a position described by them. The appellant contends that this testimony was incompetent for the reason that the conditions under which appellee's witnesses made their observations were not substantially or essentially the same as were the conditions under which appellee was injured.

The authorities are unanimous in holding that experiments made after the injury occurred to test the accuracy or inaccuracy of the testimony of witnesses to the occurrence must be made under conditions that are substantially or essentially the same as were the conditions at the time of the occurrence in order to render such experiments competent. See numerous authorities cited by learned counsel for appellant.

We are of the opinion that the court did not err in holding that the conditions under which the experiments were made by the witnesses on behalf of the appellee were substantially the same. It is true that the witnesses who made these observations were not on an engine, moving at a speed of thirty-five or forty miles an hour, but there was testimony of expert passenger engineers to the effect that one accustomed to the movements of an engine could see a man as plainly from an engine going thirty-five or forty miles per hour as one standing or walking on the track. This testimony, although contradicted by expert passenger engineers, testifying for appellant, was, nevertheless, sufficient to render the testimony of the witnesses for appellee competent so far as the essential similarity of viewpoints was concerned. The court heard the engineer describe, and saw him demonstrate before the jury, the position of appellee when he was injured, and heard the appellee describe the position in which he was sitting and saw him demonstrate that position before the jury. The court also heard the testimony of the witnesses, describing the position in which they placed a man on the

platform, supposed to be the position in which appellee was placed at the time he was injured.

The witness who, in the experiments, was placed in the position to represent the position in which appellee was placed at the time of his injury, states: "I got in the same position, supposed to be, that the man was that got hurt. I remained in a reclining position during the time the people were taking the observations from a distance up the track."

We must assume, therefore, that the court, by admitting the testimony objected to, found that these positions were substantially the same.

The record shows that the attitudes of the witnesses making the experiments, and of the appellee at the time of his injury, were demonstrated before the court and jury. These attitudes can not be shown here, and, indulging every presumption in favor of the ruling of the trial court, we must hold that the court found that the position of the witness who, in the experiment, was intended to represent appellee's position, was essentially the same as that appellee had at the time of his injury, as described and demonstrated by the engineer and appellee before the jury. There is nothing in the record to show that these positions were not essentially the same.

The court, therefore, did not err in admitting the testimony of the witnesses who made the experiments on behalf of the appellee.

(3) The remarks of the attorney for the appellee, in his closing argument, to the effect that he thought "that the old engineer was blind," was but an expression of his opinion, and not improper. He had the right to draw such deduction, stating it as his own conclusion, from the evidence, however farfetched it may have been. The jury, as sensible men, could not have been prejudiced against appellant on account of this argument. The jury heard the testimony of the engineer and the other witnesses and knew whether the attorney's conclusion was correct or not. It was a statement of the attorney's belief from

the evidence that "the old engineer was blind," and not a statement that such was a fact.

(4)  The issue of negligence was whether or not the employees of appellant were exercising ordinary care in keeping the constant lookout required by the statute, and whether, in the exercise of such care, they discovered or should have discovered that appellee was a human being, and therefore in a perilous position, in time to have avoided injuring him.

The court correctly instructed the jury on this issue. Instruction No. 2, set forth in the statement, and instruction No. 3: "You are instructed that, before you would be authorized to find for the plaintiff, that you must find, first, that he was injured by reason of the neglect of the employees of the railroad company to keep a constant lookout; and, second, that, had such lookout been kept, that the employees of defendant company could have discovered that plaintiff was in actual danger or peril of injury in time to have prevented injuring him by the exercise of reasonable care after discovering such peril," given at the request of appellant correctly defined the issue under the evidence. In these instructions both sides had the law defined covering the phases of the testimony tending to prove their respective contentions. Instruction No. 2 was not open to the specific objection which appellant contends it made to it by its request for instruction No. 15, which the court refused. Because, when the court told the jury that before they could find for the appellee, they must find that the employees of the appellant, by exercising ordinary care, saw or could have seen appellee in a perilous position in time to have avoided injuring him, this was tantamount to telling them that they must find that the employees of appellant, by exercising ordinary care, saw or could have seen that appellee was a human being, and therefore in a perilous position, in time to have avoided injuring him, etc.  Appellee, so far as the duties of the employees of appellant were concerned, was not in a perilous position until they discovered or could have discovered that he was a human being.  There-

fore, telling the jury that they must find that the employees saw or could have seen that appellee was in a perilous position before they could return a verdict in his favor was equivalent to telling them that they must find that the employees saw or could have seen that he was a human being and in a perilous position, etc.

Instruction No. 3, given at the instance of appellant, uses substantially the same language in presenting the contention of appellant as that set forth in instruction No. 2, given at the instance of appellee. The court did not err therefore in granting appellee's prayer for instruction No. 2, and in refusing appellant's prayer No. 15.

Even though appellant's prayer No. 15 was correct, it was not error to refuse it, because it was fully covered by the instructions which the court gave. *St. Louis, I. M. & S. Ry. Co.* v. *Leflar,* 104 Ark. 528; *St. Louis, I. M. & S. Ry. Co.* v. *Aiken,* 100 Ark. 437; *St. Louis, I. M. & S. Ry. Co.* v. *Clements,* 93 Ark. 15; *St. Louis, I. M. & S. Ry. Co.* v. *Garner,* 90 Ark. 19.

(5)    The measure of damages is what the jury may find from the evidence to be a fair and just compensation with reference to the pecuniary and other losses which appellee has sustained by reason of his injuries. In determining this the jury should take into consideration his age, health, habits, occupation, expectation of life, mental and physical capacity for and disposition to labor, personal expenses, for treatment, rate of wages, earning power and probable increase or diminution of that power with the lapse of time, pain and suffering which he has endured and shall continue to endure, and mental anguish on account of the disfigurement of his person.

All these are proper elements for the consideration of the jury in determining the amount of his compensation. The jury, in determining the amount that shall represent the present compensation to the plaintiff for all damages of every character which he has sustained by reason of the injuries, should reduce whatever amount they found to be due the plaintiff to its present value and return their verdict for that amount. See Sutherland on

Damages, vol. 4, chap. 36, sections 1241 to 1252, inclusive. See, also, *St. Louis, I. M. & S. Ry. Co.* v. *Sweet,* 60 Ark. 560; *St. Louis, I. M. & S. Ry. Co.* v. *Hitt,* 76 Ark. 224.

Mr. Sutherland says that the material inquiries in regard to the pecuniary loss on account of diminution of earning power are as follows: "What is a pecuniary equivalent for this loss per year, and how long will it continue? The answer to them must be chiefly found in the nature of the injury, the age and general health of the injured party, and his antecedent earning capacity as indicated by his qualifications and the character of his business or calling. In respect to years to come, the recovery will be like payment in advance, and the amount should be reduced to its present worth." Citing, *Fulsome* v. *Concord,* 46 Vt. 135; *The William Branfoot,* 48 Fed. Rep. 914.

It follows that when appellant objected to appellee's prayer No. 3, on the measure of damages, for the specific reason that "it ignored the reduction to the present value of the matters that are mentioned in it," the court should have told the jury that the amount found by them should be reduced to its present value. But when the whole record on the subject is considered, as set forth in the statement, we are of the opinion that there was no prejudicial error to appellant in the court's failure to so tell the jury.

The court requested counsel who made the specific objection to the instruction "to offer any instruction that they might want given upon the matter of the sum that might be awarded to the plaintiff by reason of his inability to labor being reduced to its present worth." Then the record shows that the attorney who made the closing argument for the appellee, after stating the amount which he calculated from the evidence that the plaintiff had lost by reason of his diminution in earning power, said that "the jury should reduce this to its present value to determine what his loss is." This shows that the appellee, through his counsel, interpreted the court's instruction to mean that the amount found by them must be reduced to its present value. As the appellee was only insisting

on the present value of the loss that would accrue to him in the future by reason of his diminished earning power, the jury were not justified in awarding him a greater sum than such amount when reduced to its present value.

(6)    The court did not err in refusing appellant's instruction No. 1, directing the jury to return a verdict in its favor. The issue of negligence, under the evidence, was one of fact for the jury. The evidence was sufficient on that issue to sustain the verdict.

(7)    The verdict is excessive.

Counsel for appellee, in his closing argument, said: "It will be $28,860 that he has lost by reason of the fact that he will never work again. That amount the jury should reduce to its present value to determine what his loss is."

It is probable, from the amount of the verdict, that the jury misunderstood the suggestion of counsel that the amount should be reduced to its present worth and instead allowed appellee for his earning power the full sum of $28,860. Seven hundred and eighty dollars, the amount he was earning per annum, multiplied by 36.7 years, his expectancy, would equal $28,626.

If the jury fixed upon $780 as the sum which appellant would have received for 36.7 years had he lived, then this amount reduced to its present value would have equaled $15,249.

This amount is according to the figures presented by appellant's counsel, and appellee's counsel concede that these figures are correct upon the basis of a loss of $780 per annum, but appellee contends that the jury could have and should have found that appellee's earning power should have been calculated on a basis of $1,680 per annum, or $140 per month, instead of $780 per annum, or $65 per month, the amount that he was receiving at the time of his injury.

While the testimony shows that appellee was efficient in his work, and was in the line of promotion, the jury would not have been justified in increasing the salary that he was receiving at the time of his injury, towit, $780 a

year, to the sum of $1,680 a year. That was an increase out of all proportion to what the evidence would justify as his probable increase of earning power, and such an estimate would ignore all contingencies of sickness and probable failure to secure promotion and employment. These the jury would have to consider and counterbalance against the probability of promotion and continuous employment for the full period. That estimate also would leave out of consideration the fact that appellee, although deprived of his lower limbs below the knees, was not shown to have been totally disabled from securing some kind of remunerative employment.

Even at an annual income of $1,680 as wages, without deduction, for the full period of appellee's expectancy, the sum reduced to its present value would have been $27,370. That would have left $7,636 for the other elements of damage.

The appellee is horribly maimed. He has suffered intensely, and will continue to suffer as long as he lives. There is no fixed standard of value for the physical pain and suffering, and the mental anguish which he has endured, and must endure. These are not susceptible of adequate measurement, for no price has been nor can be set upon human limbs. No normal person would endure the physical pain consequent upon the loss of his legs, and the mental anguish caused by such disfigurement, for all the gold in the world. But the law affords to one who has been thus injured through the negligence of another just and reasonable compensation. It is the peculiar province of the jury to determine from the evidence what the damages by way of compensation should be. But when the jury has named the amount, it is at last for the courts to say whether this amount exceeds the bounds of reasonable compensation as the law prescribes.

While it is impossible for this court to know precisely the elements that entered into the minds of the jury in arriving at a verdict of $35,000, it is certain that this amount far exceeds the sum that the jury should have allowed as covering all the elements proper to be consid-

ered by them when fixed according to the correct rule of giving appellee present compensation for all the damages which he has and will sustain.

In our opinion a judgment in the sum of $25,000, will fully compensate him for all damages growing out of his injuries. The judgment of the lower court will be modified and affirmed for this sum.