SHAVER *v.* PARSONS FEED & FARM SUPPLY, INC.

5-1798                                              322 S. W. 2d 690

Opinion delivered April 13, 1959

*Rex W. Perkins* and *E. J. Ball,* for appellant.

*Crouch, Jones & Blair,* for appellee.

CARLETON HARRIS, Chief Justice. Appellants instituted suit against appellee and Thurman Parsons and Glen Parsons,[1] seeking judgment for $2,732, alleging that amount of damage to have occurred because of the failure of appellee to deliver a load of grapes to a designated

---

[1] At the conclusion of the taking of testimony, appellants took a non-suit as to Thurman Parsons and Glen Parsons individually.

point in proper condition. The complaint alleged that appellee is a common carrier of goods for hire, is engaged in shipping produce in interstate commerce, and that on August 16, 1957, appellants delivered to appellee 5,400 four quart baskets of Fredonia grapes, U.S. No. 1 table grade, at Springdale, Arkansas, for immediate shipment to Super Valu Stores, Inc., near Minneapolis, Minnesota. Further allegations relate that the grapes were placed in a refrigerated trailer, which departed from Springdale about 11 p.m. on said date; that at the time the grapes were accepted, the fair market value of same was $3,132, but at the time of arrival at the destination, the grapes had spoiled, and had a value of only $600. It is then alleged ''That the goods were spoiled because of the negligence of the defendants, their agents and employees in failing to maintain the refrigerated trailer in a working condition, and in failing to re-ice said trailer at the proper time, and in failing to repair said refrigeration equipment in said trailer when said defendants, their agents, servants and employees knew or had reason to know that said equipment was not operating properly, and that if said equipment was not operating properly that said grapes would be spoiled and unfit for human consumption.'' The driver of the truck was Johnny Freeman, alleged to be the agent, servant, and employee of appellee. The Shavers alleged that they had incurred expenses in the sum of $200 in selling the grapes for salvage only, and then prayed judgment as set out above. Appellee answered, denying any negligence, and asserted that if the goods were spoiled ''such spoilage was due to the negligence of the plaintiffs themselves in overloading and improperly loading the trailer unit described in plaintiffs' amended and substituted complaint in such a manner as to prevent the proper functioning of the refrigeration system in said trailer unit, and if the grapes described in plaintiffs' amended and substituted complaint were spoiled or damaged in any manner, that said spoilage or damage is directly attributed to the negligence of the plaintiffs themselves and is a complete bar to their right of recovery.'' Appellee filed a counterclaim in the amount of $1,000, based on the assertion that Freeman, after the shipment was

refused by Super Valu, was directed by appellants to deliver the grapes to a winery near Morrilton, Arkansas, and that appellants had refused to pay for such service. The cause proceeded to trial on August 11, 1958, and the jury returned a verdict for appellee as against appellants' complaint, and found for appellee on its counterclaim against appellants in the amount of $250. Judgment was accordingly entered, and from such judgment, comes this appeal.

A reversal of the court's judgment is urged solely upon one point, viz, "The trial court erred in admitting into evidence certain hypothetical questions and the answers thereto by witnesses Forrest Hazel and Joe Robinson."

Appellants first assert that neither Robinson nor Hazel qualified as experts, not being engineers, and the court erred in permitting them to testify to any facts concerning refrigeration. We do not agree. It is true that the witnesses were not engineers, but both had long years of experience in the field of wholesale produce, and had shipped all types of fruits produced in the area, including Fredonia grapes, to points over the entire United States. Robinson has been engaged in such business for 20 years, and Hazel about 43 years, and both have made shipments in the same size trailer used in the shipment under discussion. Each appears qualified on the basis of experience to answer the questions propounded to them, and to render the opinions complained of.

The proof reflects that 5,400 baskets of Fredonia grapes were loaded in a thirty-three foot Trailmobile refrigerated trailer on a rather warm day in Springdale, and that at the time of the loading there was no refrigeration. The evidence further reflects that appellants began loading the grapes around 5 o'clock in the evening of August 16, 1957, and completed the loading around 1 o'clock the following morning. The trailer left Springdale at that time with a bunker full of ice, and proceeded on toward its destination. The blower fan was in operation at all times except for short periods occasioned by the gasoline motor that operated the fan running out of

gas. This would be filled at the next station, and after several such occurrences, Freeman purchased a gasoline can and took enough gas with him to fill the motor when it would become empty. At Osceola, Iowa, Freeman put more ice in the truck, though not filling it. "I lacked a little bit of filling it up. They had — the ice plant had to haul their ice from Des Moines, and they didn't have enough to let me fill up." The bunker was filled completely at Albert Lea, Minnesota, and then the trailer proceeded on to Hopkins, Minnesota, a suburb of Minneapolis, where Freeman was to deliver the grapes at 8 o'clock the next morning. Freeman testified that he went to sleep in the truck around 11:30 or 12 o'clock (Sunday night, August 18th). On awakening around 5 a.m., he discovered that the motor on the "Thermo King" was not working, and the refrigeration had gone off. After trying unsuccessfully for some time to start it, he proceeded on to the dock where he was to unload. From his testimony:

"Well, after I seen I couldn't get it started, why, I knowed I couldn't get nothing done before eight o'clock, because they just don't open up till eight o'clock, so I said, 'Well, I'll just pull around here and see if I can find the dock where I'm supposed to unload.' So, I started on out to find my dock."

About 8:30 or 9 o'clock, representatives of the Super Valu Store came and inspected the grapes, and refused to accept the shipment. At this time where was still about 500 pounds of ice in the bunker. These representatives of the company testified that the pulp temperature was far in excess, throughout the load, of what the normal temperature should have been. These witnesses also testified that many of the grapes were crushed and loose from the stems, as well as moldy. The testimony revealed that the "Thermo King" was broken and not in operating condition. The evidence also reflected that the grapes were loaded to within about a foot and a half of the nose of the trailer, and within four inches of the ceiling from there to the back. Freeman testified that the grapes were within three inches of the blower.

Counsel for appellee propounded to witness Robinson a hypothetical question, which was objected to by appellants' counsel. After three objections to the question had been sustained, the following question was asked on the fourth attempt.

"Taking a fact of the situation, where a thirty-three foot refrigerated trailer was loaded in Springdale, Arkansas, on Friday evening and early Saturday morning, and left Springdale approximately one o'clock Saturday morning with a bunker full of ice; that the weather at that time, or had been the preceding day, was quite warm; that as the trailer proceeded, the blower fan was in operation constantly, except for short periods when the gasoline fan would run out of gas and would be filled at the next filling station; where the trucker almost completely refilled its bunker in Osceola, Iowa; where the trucker refilled its bunker completely at Albert Lea, Minnesota; and where the truck was parked in a small town near Minneapolis, Minnesota, on Sunday night, and the weather was described as a bit chilly as dawn came; and that the blower fan unit went out of operation some time between the hours of 11:30 and dawn and stayed out of operation until the grapes were inspected around 8:00 o'clock Monday morning. Based on that fact of the situation, and there was approximately five hundred pounds of ice when this was checked after the grapes were inspected on Monday morning, this ice being in the bunker; and that the grapes——?

Appellants' Counsel: Excuse me, I thought you were through.

Q. ——the grapes had been stacked on a loading dock and were not under refrigeration before they — for some hours before they were put in the truck, based on this fact of the situation, would you tell the jury whether or not the fact that the blower fan was out of operation for the period of time stated, would have any effect on the grapes in terms of molding or in any other terms of their condition?

The Court: I'll let him answer it."

No actual objection was made to this question, though appellants' counsel made the statement: "I hate to keep objecting to it." The witness started to answer, "I'll answer it this way: If the grapes were in good shape at midnight on Sunday night——." Appellants' counsel then objected on the grounds that the answer was not responsive to the question, but thereafter, the following colloquy took place:

"Appellants' counsel: If Mr. Robinson thinks he can answer it fairly or squarely, let him answer it yes or no.

The court: Do you think you can answer it fairly and squarely?

A. I can answer it as it would concern my own business, if that would be fair and square.

The court: All right."

The witness then answered the question as follows:

"A. If the grapes were in good condition midnight Sunday night, they would have been all right Monday morning when they opened the trailer, and the fact that they were iced at Albert Lea, if the bunker was filled there, it would indicate that the fan would have had to have been in operation somewhere between there and Minneapolis, to use up that much ice. You just don't use the ice unless the fan is running. It's just like being in an ice box, and it just lays there. If the fan runs, it's using up the ice; so if there was only 500 pounds left, that would indicate to me, based on my experience, that the fan had been in operation somewhere between Albert Lea and Minneapolis."

No objection was made by appellants' counsel to this answer; however, even if the objection had again been made that the answer was not responsive to the question, we would not consider such objection well taken. See *Wilson & Co.* v. *Smith,* 169 Ark. 1054, 278 S. W. 31.

Appellants first complain that this question was, in the main, propounded to the witness in the presence of the jury four different times, and this repetition resulted in prejudice to them; however, the earlier questions

were objected to by counsel, and the objection being sustained, some repetition was necessary if the question were to be asked. Certainly, it does not appear that the question was indiscriminately or purposely repeated. Appellants complain that the hypothetical query was improper and prejudicial for the reason that the following facts were not included:

"1. The width, height and length of a 'thirty-three foot' trailer.

2. The storage capacity of the ice bunker in a 'thirty-three foot' trailer.

3. The kind and condition of grapes in the 'thirty-three foot' trailer.

4. The distance and time to travel to Minneapolis, Minnesota, from Springdale, Arkansas, and the distance and time between re-icing stations.

5. The temperature in Minneapolis on the morning of August 19, 1957, at 9:00 o'clock a.m.

6. The temperature of the grapes inside the truck at Minneapolis on the morning of August 19, 1957, at 9:00 o'clock a.m.

7. The size of the baskets of grapes placed in the trailer.

8. The number of baskets of grapes that were in the stack inside of the trailer.

9. The correct time of inspection of the grapes on the morning of August 19, 1957, which was 9:00 a.m.

10. The condition of the grapes at the time of departure from Springdale, and the outside temperature." As to the first two points, there was no proof. As to point three, the witness had already testified that he was familiar with Fredonia grapes. As to points four and five, there is no evidence. As to point seven, the witness had already indicated his knowledge of the size of the baskets (four quart), which evidence was heard by the jury. Relative to point eight, the witness had already been advised that 5,400 baskets had been placed

in the trailer, and his answer was evidently based on that knowledge. There was no proof as to the condition of the grapes at the time of departure from Springdale (10), nor the outside temperature, except that it was warm. As to point nine, the evidence reflected that the grapes were inspected at approximately 8:30 or 9:00 a.m.

While it would appear that the storage capacity of the ice bunker, and the distance and time between re-icing stations, as well as the number and length of times that the gasoline motor was not functioning during the trip, would be particularly pertinent information — these matters were not included in the evidence, though the witness himself was apparently familiar with the size of the bunker. However, if appellants considered that the question did not include all pertinent information, such deficiencies could have been supplied through cross-examination. By this means, appellants could have interrogated the witness as to each condition, or each particular point raised herein, that they considered would vary or change the witness' answer. In fact, appellants' counsel, on cross-examination, asked the question, ''Would it make any difference in your answer to the jury here, had the fan been out for a period of time, because he didn't have gasoline to operate it?'' Over objection, the trial court directed that the witness answer, but counsel withdrew the question. In *Wigmore on Evidence*, Vol. II, Sec. 683, page 811, we find:

''For the mode of stating the assumed premises, there is no fixed rule. Where the facts have not yet been testified to at all, there is only one way — the oral statement of the premises by counsel. But where testimony already offered is taken as the basis, either the testimony of a given witness may be read aloud, an assumption of its truth being then made, or an oral statement by counsel, in impersonal form, of such assumed premises may be used; the judge's discretion determining the choice.
\* \* \*

Just as the cross-examination of an ordinary witness may involve questions which test his memory, ob-

servation, and bias, so in cross-examining one who takes the stand as a skilled witness, his judgment upon germane matters may be tested by assuming premises and asking his conclusions."

As stated in our own case of *Missouri-Pacific Railroad Company* v. *Hampton,* 195 Ark. 335, 112 S. W. 2d 428:

"Appellants next contend that the court erred in permitting Dr. McGill to testify to the hypothetical question that in his opinion the death of deceased was caused by the injury. The appellants' attorney objected to the question and the court asked him on what ground. He stated: 'On the ground that he hasn't given the statement that the man never claimed to be injured or given any history of the injury to the doctors who treated him or made any complaint of that kind at all.' * * *, *if appellants' counsel thought there were any facts omitted from the question which were essential to forming a conclusion, his remedy is to put those additional facts before the witness on cross-examination.'"[2]

This, unquestionably, is the general rule.

The questions asked Mr. Hazel by appellee were predicated on appellee's defense that the trailer was overloaded, and its contention that this fact was responsible for the condition of the grapes upon the arrival of the shipment in Minneapolis. Hazel testified that he had loaded grapes in the same size trailer as the one used by appellee, usually loaded from 3,300 to 3,700 boxes, that to load more fully would prevent circulation of air for the refrigeration; and that the higher the baskets of grapes were stacked, the more weight there would be on the bottom baskets. In answer to a hypothetical question, he testified that the heavy loading of the grapes in the instant case would have had an effect upon the circulation of air in the refrigeration system on the truck. We find no error. As heretofore pointed out, Hazel had over 40 years experience in shipping produce, and would appear entirely qualified to express an opinion as to the proper load to be placed in the trailer. Appellants could have exercised the same privilege with this witness as

---

[2] Emphasis supplied.

herein pointed out with reference to the witness Robinson, *i.e.*, if the hypothetical question was incomplete, appellants' theory could have been presented through cross-examination.

Finding no reversible error, the judgment is affirmed.