BUGH *v.* WEBB.

5-1902                                   328 S. W. 2d 379

Opinion delivered October 19, 1959.

[Rehearing denied November 23, 1959]

*Bernard Whetstone* and *Joe B. Hurley,* for appellant.

*L. B. Smead, W. R. McHaney, Melvin E. Mayfield,* for appellee.

PAUL WARD, Associate Justice. This litigation arises out of a "drag-racing" incident. The principal question to be resolved is: Does a guest assume the risk of injury when he consents to ride with one who engages in drag racing? Most of the material background facts leading up to the issue here involved are not in dispute.

On Saturday night, September 14, 1957, the appellee, Charles Webb (a minor), was riding in a Dodge car being driven by appellant, Joe Bugh (a minor), when Joe engaged in an automobile race, commonly known as a "drag race", with a Ford car being driven by one Jerry Smith on Highway No. 7 about one and one-fourth miles north of Smackover. Incident to the race a pickup truck was struck by the Ford car and instantly thereafter by the Dodge car, resulting in damage to the vehicles involved and in injuries to Charles. Charles' father, individually and as next friend of Charles, brought suit against Joe and his father to recover damages.

Upon a trial the jury returned a verdict in favor of the complainants and from the judgment entered thereon, the Bughs prosecute this appeal. For a reversal appellants rely on one ground only, *i. e.,* that the trial court erred in refusing to instruct a verdict in their favor. After much deliberation we reach the conclusion that the trial court erred in refusing to grant appellants' motion because, we think, appellees' own testimony shows that Charles assumed the risk.

At the close of plaintiffs' testimony appellant moved for a directed verdict. This motion was based on several different grounds which included the guest statute, joint enterprise and assumption of risk. The motion was overruled and exceptions duly saved. When the trial judge overruled appellants' motion for a di-

rected verdict he stated that he thought the testimony of Charles Webb was sufficient to make a jury question. We, likewise, think that the issue depends almost entirely upon the testimony of Charles Webb and we shall set out that testimony in some detail, but first we refer briefly to the testimony of appellees' other witnesses.

Wylie Parham, a State Policeman, testified that the collision occurred at approximately 7:45 P. M., Saturday, September 14, 1957, and that he appeared on the scene approximately thirty minutes later; that Highway No. 7 on which the collision occurred "is a very heavy traveled highway" and that "the traffic at all times is heavier on Saturday nights than at other times". Clifford Brewer testified that he lives on the outskirts of Smackover and that he heard the collision and that it happened on the highway near a drive-in. Ivy Fowler, who was driving the pick-up truck, stated that he was in the process of making a turn from the highway when he "heard a loud, roaring noise" and saw a car coming trying to get around him; that the Ford car (driven by Smith) hit his left front fender and almost simultaneously another car hit the pick-up truck from behind and knocked him two hundred feet across the road into a ditch, and that the second car that hit him was a Dodge car. Curtis Butterfield testified that he knew Charles Webb and that he saw him at a dance a short while before the collision occurred. The father of Charles Webb and the father of Joe Bugh each testified but gave no testimony material to the issue here to be decided.

The uncontradicted testimony shows that this portion of Highway No. 7 where the drag racing took place was a heavily traveled highway and particularly so on Saturday nights. This was testified to by the highway policeman and was admitted by Charles Webb. The testimony shows beyond question that Charles Webb had engaged in drag racing on previous occasions not only with Joe Bugh but with the other boys involved on this occasion. This is shown by his own testimony:

"Q. Also, when you were working at Kenova and they were in school would you come at noon time and you all would have drag races toward the colored schoolhouse, or, did that occur?

A. Once or twice.

Q. That was after you were working at Kenova and they were going to school?

A. Yes, sir.

Q. And you had already assumed the position of a young man and you were making $265.00 a month at that time, and they were in school, is that right?

A. Yes, sir, that's right.

Q. And you did take your noon hour off and come up and drag race with them during the noon hour, is that right?

A. Not very often, once or twice.

Q. But you've done that, haven't you?

A. I have done that.

Q. Do you remember dragging anywhere at night when Malory was present and Joe was present?

A. One time on the bridge, out there, it might have been after dark, that's all the time I recall."

Witness Charles Webb also stated that he remembered dragging one time with Jerry Smith out on what was called "Nigger Hill" about two miles south of Smackover.

"Q. And Malory Neal has gone with you dozens of times when you and Malory would be together and you would drag against somebody?

A. No, sir; not many times.

Q. About how many times have you ever dragged with Malory Neal with you?

A. Probably two or three times, would be the most.

Q. How frequently were you and Joe together for the last five months before this collision?

A. We were together several times a week.

Q. And many times you would bring your car over to his house, and leave your car there, and the two of you would get in his car and ride around, didn't you?

A. Not many times; I have done it.

Q. At other times he would park his car and ride with you, wouldn't he?

A. Yes, sir.

Q. You have seen him break the speed limit a few times, is that what you are saying?

A. I have seen him break the speed limit.

Q. And you and him were both interested in dragging, generally, isn't that right?

A. I dragged with him a few times.

Q. And you and him were interested in the subject of drag racing?

A. I guess so.

Q. You and him talked about dragging and racing?

A. On a few occasions.''

Charles Webb's testimony likewise shows that he knew they were going to drag race on this particular occasion. In speaking of Jerry Smith who was driving the Ford car the witness stated:

''A. He pulled over on the lefthand side of the slab and Joe pulled up beside him.

Q. Well, let's get this straight; now, did you know when Jerry parked on the lefthand side of the slab, or not?

A. I noticed him over there when Joe pulled up beside of him.

Q. Now, what did you think when you saw Jerry Smith stop over on the lefthand side of the slab?

A. And then we pulled up beside him and they counted and took off.

Q. Well, here's my question, though: What did you think when you saw this car stopped there on the lefthand side of the road?

A. I didn't know what to think. I thought that Joe was going to pull up—

Q. You were real familiar with **drag racing,** weren't you?

A. Yes, sir, I was familiar with it.

Q. And then he (Joe) stopped and they were abreast of each other and both of them stopped, is that right?

A. Yes, sir.

Q. At that time did you have any idea what was about to happen?

A. Yes, sir, I had an idea of what was going to happen.

Q. I believe you said you realized, though, when they both were stopped there by the side of each other, you realized for the first time that they were going to drag, is that right?

A. That's right.

Q. And the cars were stopped at that time?

A. Until they counted one, two, three.

Q. Yes, sir, and all the time they were counting one, two, three you knew they were fixing to drag?

A. I thought that was what they were fixing to do.''

Charles Webb at no time contends that he made any effort to get out of the car or that he in any way

voiced his disapproval of what he knew was about to take place. In view of the above admissions and the undisputed facts as we have disclosed them it is our opinion that Charles Webb, as a matter of law, assumed the risk and that he should not be allowed to recover in this case.

In this State our court has recognized that the defense of the assumption of the risk applies not only in master and servant cases but that it also applies in ordinary cases of negligence. This was discussed in the case of *Chicago, Rock Island and Pacific Railway Company* v. *Lewis,* **103 Ark. 99, 145 S. W. 898. In that case** the court stated: ''The doctrine of assumption, or, as sometimes termed, acceptance of the risk is founded on the maxim *'volenti non fit injuria'.* It is generally applied as part of the law of master and servant, but it is a distinct principle of law which may be otherwise applied in some instances.'' See also *St. Louis and San Francisco Railroad Company* v. *Fritts,* 85 Ark. 460, 108 S. W. 841.

In the case of *Peay* v. *Panich,* 191 Ark. 538, 87 S. W. 2d 23, appellant contended that appellees' Instruction No. 4 was erroneous because it stated that a guest assumes the usual and customary habits of the driver which are known to the guest. The court, however, rejected this contention stating: ''We think this instruction is a correct declaration of the law, when measured by the facts and circumstances of this case. The great weight of authority is to the effect that one who enters an automobile as a guest takes not only the car as he finds it but also assumes the known risks incident to the driver's incompetency, inexperience and driving habits''.

In an article by Robert S. Lindsey found in Volume 10, Arkansas Law Review at Page 70, the writer stated: ''Many of us are in the habit of thinking that assumed risk is peculiar to master-servant cases but that is not correct. Not infrequently the same set of facts from which contributory negligence has been argued can be the basis for an assumed risk defense''. This state-

ment we find is fully justified by the authorities. The rule which we think is most applicable in the case under consideration is set forth in 15 A.L.R., Second, Page 1180, Section 9, under the heading "Assumption of Risk." It is there stated that the necessary elements of assumption of risk by guests are clearly defined as follows: "First, there must be a hazard or danger inconsistent with the safety of the guest; second, the guest must have knowledge and appreciation of the hazards; and third, there must be acquiescence or willingness on the part of the guest to proceed in the face of danger."

Applying the rules above announced to the case under consideration we cannot escape the convictions; first, that the hazard of drag racing at night on such a heavily traveled highway was inconsistent with safety; second, that Charles Webb was fully cognizant of this hazard and third, that he had an opportunity to make a protest of some nature but wholly failed to do so. Since the testimony on which these conclusions are founded was furnished by appellee, Charles Webb, himself, and since it is susceptible of only one reasonable interpretation, no jury question was presented.

It is our conclusion, therefore, that the trial court erred in not sustaining appellants' motion for a directed verdict and the judgment of the court is, therefore, reversed and the cause of action dismissed.

Reversed and dismissed.