## INTERNATIONAL HARVESTER CO. *v.*
### Earl PIKE

5-5427 466 S. W. 2d 901

### Opinion delivered February 15, 1971
[Rehearing denied May 10, 1971.]

*Wright, Lindsey & Jennings,* for appellant.

*J. Hugh Lookadoo* and *McMath, Leatherman, Woods & Youngdahl,* for appellee.

Lyle Brown, Justice. Appellee Earl Pike obtained judgment for personal injuries and property damage

against International Harvester Company and its Malvern distributor, Burks Motors Inc., as a result of a mechanical failure of appellee's International transport truck, which failure substantially wrecked the transport and caused serious injuries to appellee. This appeal is by International, in which several points for reversal are submitted and to which we shall later refer. Burks Motors filed a separate appeal because its single point is adverse to International—case number 5-5425.

At the time of the mishap appellee was engaged in the long haul truck transport business and was hauling bulk flour from Arkansas City, Kansas, to Little Rock, Arkansas. He lived in the Malvern area. In the spring of 1965, after negotiating with the International Harvester zone officials at Little Rock and the International distributor at Malvern, Burks Motors, appellee purchased a new 1965 model truck to replace an old truck. The new truck was delivered to him in July 1965. The cost was $24,785.17. In December 1965 appellee experienced his first trouble with the torque arm assembly. The mechanism is located under the fifth wheel and the purpose is to prevent the axle from going forward or backward when the truck is accelerating or slowing down. Within a period of six months appellee had trouble with the assembly on four occasions.

*The first occasion.* About two months after the purchase of the truck, appellee and his brother were unloading flour in Little Rock. The brother noticed a loose bolt in the torque rod assembly. It was the bolt that held the torque rod assembly to the differential. The truck was taken to International's shop in Little Rock. The brothers testified that International had the bolt and bushing repaired at a machine shop. The brother, Marvin Pike, testified that the nut at the end of the bolt was loose, and that the looseness was caused by some internal wear in the assembly. Appellee said he was instructed by the shop manager to take the truck to Burks Motors in Malvern for future repairs.

*The second occasion.* In February 1966 the same bolt again became loose and the truck was taken to

Burks Motors. Appellee testified that the bolt was worn, that defect being visible once the bolt was removed. That was the bolt which had been inserted by International Harvester in Little Rock. Mr. Burks testified that the bolt had to be replaced. He had the replacement bolt made at a local machine shop since none was carried in stock. Witness Burks stated that he did not know the hardness of the metal in the bolt; that the bolt was not secured by a self-locking nut because the threads would not take it; and he did not know whether the bolt and nut were torqued.

*The third occasion.* On March 4, 1966, the machine shop bolt broke or fell out and the differential housing landed on the pavement. There was no serious damage done because the vehicle was travelling at slow speed. The truck was towed to Burks Motors.

*The fourth occasion.* Among other repairs, Burks Motors again replaced the torque arm bolt. Burks testified that he called Memphis, Hot Springs, Texarkana, Little Rock, and Dallas, and finally located one on March 9 in Dallas. He said he was looking for a ¾" bolt, 6½" long. Burks ordered the bolt under the catalog number 753029C1. A loose-leaf catalog insert had been sent to all dealers in 1964 showing that the 753029C1 bolt had been replaced with a 757815C1 bolt. The witness said he did not keep up with the numerous inserts, "but, even if we order a number of bolt that has been replaced, International Harvester automatically sends the correct part." The bolt received from Dallas (and which was installed) was about ½" shorter than the International Harvester bolt removed in February. The witness testified that when he called Little Rock concerning the bolt, that office gave him the number 753029C1. Appellee testified that the truck was obtained by him from Burks Motors on March 10. He said he looked at the bolt before leaving and observed that it had a nut on the end which had been tacked on with a weld; and that the bolt had sleeves and washers on it. Appellee made a trip to Arkansas City, Kansas, without mishap. He started on his second trip on March 17. A short distance from Malvern the torsion bolt was said

to have broken, the front drive differential turned over, and went underneath the back drive axle, causing the damage to the truck and personal injuries to appellee. It is on the basis of that experience that appellee filed his suit.

So much presently for the four described incidents. Appellee testified that when he placed an order for the truck he specified the heavy type torque rod with the assembly mounted on springs instead of rubber pads. The truck was not equipped as desired and appellee said he voiced an objection. He said the dealer insisted that he take the truck and try it and if appellee was not satisfied a change would be made.

Logan Ross testified for appellee. He is in business in Malvern, specializing in buying and repairing Ford and International trucks. He has been so engaged for well over thirty years. It was his opinion that the light (as opposed to the heavy) torque rod assembly was much less preferable. He thought the design of appellee's assembly was improper and caused vibration which in turn damaged the rod.

The principal witness for appelle was Ben W. Hopkins of Little Rock, a graduate and registered consulting engineer. He examined the bolt which had been installed by International Harvester in Little Rock in the fall of 1965. He testified, as abstracted:

The bolt had been severely galled and is reduced in diameter in certain areas. This reduction in diameter affects the strength of the bolt. The galled areas evidence extremely excessive wear. The flanges on the differential housing are heavily battered and worn. This was caused by a chattering movement in the torque arm assembly. The flanges on the forward differential housing for the forward torque rod assembly have been worn in an elliptical pattern. The entire torque rod assembly which attaches to the housing is worn. Based on the wear I found in this bolt I would expect to find wear in

the component parts, that is, the other parts of the torque rod assembly with which the bolt had had contact. I found such wear. I found chewed up lumps of pressed metal when I removed the rubber which covers the portion of the forward torque rod assembly where it attaches to the housing. In my opinion the torque rod assembly end which connects with the yoke on the differential housing is of improper design. The rest of the assembly is adequate. It is my opinion that the frictional bond, under certain conditions, could not be maintained in this assembly even though it was properly installed.

The witness purchased from Burks' parts department a duplicate of the shorter bolt which was in the forward assembly when the truck wrecked. Of that bolt the witness had this to say:

Using the bolt which I bought from Mr. Burks, inserting it in the yoke arms with the bushings installed, you cannot get the self-locking nut all the way on the threaded end of the bolt. If this size bolt were used there is no way in the world that it could be installed properly; and if it was not installed properly there would have to be movement, wear, and eventual failure. There is no question about that, and there is no way you could keep it from failing. It would not make any difference how the assembly was designed, it would fail if you put the too-short bolt in there.

I am of the opinion that the torque rod assembly which was installed in Earl Pike's truck, by reason of improper design, would ultimately have failed regardless of installation.

It is my opinion, with the torque arm and the bushings worn as they were on March 10, 1966, the assembly was improperly installed. In other words the man putting it back together on March 10, 1966, shouldn't have put it back together.

Likewise, International Harvester presented the testimony of a graduate engineer who is chief engineer for Hendrickson Manufacturing Company. Hendrickson has been making torque rod assemblies since 1962. The torque rod itself, he explained, is made by another company and furnished to Hendrickson. Hendrickson furnished the torque rod assembly in question to International. We summarize the pertinent parts of his testimony:

The fact that a torque rod is lightweight means only that it weights less than some other type. It does not mean that it has less strength. As a matter of fact the light-weight torque rod is forged, whereas the heavier one is cast. The lightweight O & S torque rod assembly has more durability than the heavy one. This is because of the particular type of packing in the end assembly of the lightweight unit.

The special locking nut would not be effective if the bolt is used which is ½″ shorter than the proper one. The locking portion of the nut could never engage if the shorter bolt were used.

The old bolt was No. 753029C1 and the new one is No. 757815C1. In my opinion, with the worn torque rod assembly parts which came from Mr. Pike's truck, you could not get proper torque. I would expect a failure regardless of the bolt used, if the other worn parts were used in assembling the unit.

In my experience in working for Hendrickson I have never known of other instances where there has been a failure of the ¾″ bolt. We have been making these assemblies since about 1962. We have sold between 800,000 and 1,000,000 O & S type assemblies.

You cannot properly make the installation of the assembly in question using the old 753029C1 bolt which is 6¼″ long. You cannot get the nut far enough on the bolt to engage the locking mechan-

ism of the nut. With this nut you could never maintain any torque.

Bernard Creech, manager of International Harvester at Little Rock, testified that the first repair to appellee's truck in December 1965 was to the torque arm assembly. He explained that the inserts were loose and when the inserts were replaced it seemed to take the slack out. He corroborated Mr. Burks to the effect that if someone ordered a part by number which was out of date, he would send the proper up-to-date part. On cross-examination it was revealed that the bolt was replaced. He also agreed that appellee talked to him about installing a heavier torque rod system but to his knowledge none was available.

On behalf of appellee the court submitted the issue of negligence as against International Harvester and Burks Motors; and, as against International Harvester, the issue of implied warranty was submitted. At the request of International Harvester the court gave an interrogatory on assumed risk but refused to submit the issue of negligence on the part of appellee. The total responsibility for the mishap was fixed, ninety-one per cent to International Harvester and nine per cent to Burks. Personal damages were fixed at $70,000, and to the truck, $17,000. At the request of International Harvester an additional interrogatory was submitted asking the jury to apportion that negligence between design and in assembly or repair. The jury attributed ninety per cent to negligence in design and ten per cent to assembly or repair. (International Harvester filed a third-party complaint against Hendrickson Manufacturing Company, which supplied the torque assembly. That complaint was dismissed by the court. International wanted the last mentioned computation in the event International was successful in overturning the court's order dismissing Hendrickson.)

One of the asserted errors is that the trial court erred in refusing to grant a mistrial after appellee's attorney, in closing argument, advised the jury that an affirmative answer to the assumption of risk interrogatory would preclude recovery by appellee. The attorney

told the jury: "If the jury finds that Earl Pike assumed the risk of his own injury, he will not receive a nickel."

Pertinent to the problem mentioned is *Wright v. Covey*, 233 Ark. 798, 349 S. W. 2d 344 (1961). There the trial court told the jury, in a general instruction, that the negligence of the plaintiff would not bar recovery if the negligence was of less degree than defendant's negligence, in which event plaintiff's recovery would be diminished in proportion to plaintiff's negligence. This court did not reverse, and for this reason:

> * * * We do not think that the rather general language of this instruction, needless though it may have been, had the effect of telling the jurors anything which they as intelligent men might not have deduced from the wording of the special interrogatories.

Nevertheless, in *Wright v. Covey*, we recognized the general rule against informing the jury of the effect of their answers to interrogatories:

> The appellants rely upon the rule, often announced in other jurisdictions, which prohibits a trial court, in submitting a case upon special interrogatories, from informing the jury of the effect that their answers may have upon the ultimate liability of the parties. *Mitchell v. Perkins*, 334 Mich. 192, 54 N. W. 2d 293; *Grasso v. Cannon Ball Motor Freight Lines*, 125 Tex. 154, 81 S. W. 2d 482; *Anderson v. Seelow*, 224 Wis. 230, 271 N. W. 844. The reason for the rule is that the special interrogatories are intended to elicit the jury's unbiassed judgment upon the issues of fact, and this purpose might be frustrated if the jurors are in a position to frame their answers with a conscious desire to aid one side or the other.

Our next case dealing with the subject is *Argo v. Blackshear*, 242 Ark. 817, 416 S. W. 2d 314 (1967). There we said:

> * * * [T]his situation justifies the rule that for the

judge to specifically inform the jurors as to the effect of their answer on the ultimate judgment is reversible error.

Wisconsin has long employed the use of interrogatories and in that jurisdiction is to be found a multitude of cases on the subject. That court has consistently held as it did in *Beach* v. *Gehl,* 204 Wis. 367, 235 N. W. 778 (1931):

It is reversible error * * * [for the court] to inform the jury expressly or by necessary implication of the effect of an answer * * * to a question * * * of the special verdict upon the ultimate right of either party litigant to recover or upon the ultimate liability of either party litigant.

Our statute authorizing interrogatories, Ark. Stat. Ann. § 27-1741.2 (Repl. 1962), is similar to Rule 49 of the federal rules of civil procedure. Federal decisions comport with the cases we have cited. See *Thedorf* v. *Lipsey,* 237 F. 2d 190 (1956).

The cited authorities refer to the actions of the presiding judge, but the rule is equally applicable to court and counsel. *Erb* v. *Mutual Service Casualty Co.,* 123 N. W. 2d 493 (Wis. 1963).

Appellant next contends that the court erred in refusing to submit the issue of appellee's negligence to the jury. The court submitted the issue of assumption of risk by appellee but refused to give the jury an interrogatory on appellee's alleged negligence. "The law is well settled that whenever a fact question is made on assumption of risk or on contributory negligence, then such issue or issues should be submitted to the jury." *Aetna Casualty & Surety Co.* v. *Brashears,* 226 Ark. 1017, 297 S. W. 2d 662 (1956).

We think the issue of appellee's negligence should have gone to the jury. Trouble developed with the assembly on three occasions prior to the mishap of March 17 and within a period of some four months;

a breakdown in the assembly, because of the part it plays in the control of the truck, creates a potentially dangerous hazard; and through his experiences over the years in owning and operating several transport trucks, appellee was well versed in the structure and function of the torque assembly. (At the time of trial he had seven trucks in operation.) Logan Ross testified on cross-examination that a few months before the wreck of March 17 he observed the assembly in place and could tell that something was wrong with it; and he said he explained to appellee "what I was seeing." Ross's testimony was not controverted; in fact, he was appellee's witness. According to appellee's expert witness the bolt which was removed by International Harvester in December 1965 was severely galled and reduced in diameter in certain places, which indicated trouble in other areas of the assembly. Under the recited facts and circumstances should appellee, as a reasonably prudent man, have been content with what might be rightfully called superficial repairs? That was a question for the jury. It is only "when reasonable minds must draw the same conclusion" that a question in issue is one of law for the court. *St. Louis & S. F. Rd. Co.* v. *Rie*, 110 Ark. 495, 163 S. W. 149 (1913).

Since the case must be reversed because of the errors we have discussed, we shall touch only on those remaining points of appellant which are likely to arise upon retrial.

1. *The evidence was insufficient as a matter of law to support a verdict against appellant.* We do not agree. Appellee's expert witness testified, in substance, that appellee had been supplied an assembly which could not maintain the required frictional bond even if the assembly was properly installed. He thought the assembly would inevitably fail. His opinion was supported by the testimony of an experienced mechanic, Logan Ross. Additionally, International Harvester supplied the bolt which was inserted in March 1966, and which could not be properly installed. Those are only some of the reasons why the point is without merit.

2. *Even assuming negligence on the part of appellant, the negligence of Burks Motors was, as a matter of law, an efficient intervening cause.* Again we disagree. The point is substantially answered by our explanation under the preceding point.

3. *The court erred in giving instructions and submitting interrrogatories to the jury pertaining to breach of warranty.* The trial court, by appropriate instructions and an interrogatory, submitted the issue of implied warranty of merchantability. The trial court refused to submit the question of express warranty, apparently for the reason that the warranty had, according to its terms, expired. The third paragraph of the written warranty has the disclaimer provision:

> This warranty is in lieu of all other warranties, express or implied, including, without limitation, warranties of MERCHANTABILITY and FITNESS FOR PARTICULAR PURPOSE, all other representations to the original purchaser, and all other obligations or liabilities, including liability for incidental and consequential damages, on the part of the Company or the seller. No person is authorized to give any other warranties or to assume any other liability on the Company's behalf unless made or assumed in writing by the Company, and no person is authorized to give any warranties or to assume any liabilities on the seller's behalf unless made or assumed in writing by the seller.

With the exception of what we have reproduced in caps the remainder of the lettering is smaller than the type appearing on this page, and the lines are narrowly spaced. We cannot classify it as being conspicuous, which is one of the requirements of a disclaimer. *Marion Power Shovel Co.* v. *Huntsman,* 246 Ark. 152, 437 S. W. 2d 784; *Mack Trucks* v. *Jet Asphalt,* 246 Ark. 101, 437 S. W. 2d 459. Furthermore, there was substantial evidence that the warranty was delivered to appellee some time after the sale was made, constituting "a unilateral attempt of a party to limit its obligation." *Mack Trucks*

v. *Jet Asphalt, supra.* The court was correct in submitting the issue of implied warranty.

Reversed and remanded.

HARRIS, C. J., and HOLT, J., are of the opinion that the trial court was correct in refusing to submit to the jury the issue of appellee's negligence.