## WOODRUFF ELECTRIC COOPERATIVE CORPORATION *v.* T. J. DANIEL

5-5628                                          472 S.W. 2d 919

Opinion delivered November 22, 1971

*Wright, Lindsey & Jennings,* for appellant.

*Daggett & Daggett,* for appellee.

FRANK HOLT, Justice. The appellee brought this action against the appellant to recover damages for injuries he sustained as a result of his contact with appellant's power line. Upon interrogatories the jury found the appellee 25% negligent and the appellant 75% negligent and assessed compensatory damages at $100,000 and punitive damages at $10,000. Based upon this finding of comparative negligence, the court reduced appellee's compensatory damages to $75,000 and approved the $10,000 punitive damages. From that judgment comes this appeal.

In a multiple point appellant first contends for reversal that there was no substantial evidence to support the jury's finding that appellant was guilty of negligence that was a proximate cause of appellee's injuries and, therefore, appellant was entitled to a verdict and judgment as a matter of law. Also, appellant contends that appellee's negligence was equal to or greater than appellant's and, further, that he was a trespasser. We cannot agree with these contentions.

The appellee, 37 years of age, is a farm laborer with a third-grade education. His training and experience consists only of general farm work. On the day of the accident he was driving a tractor and planting a field with beans. Appellant's power lines sagged so close to the ground that it impeded appellee's work since he could not drive underneath them. The appellee stopped his tractor alongside the two lines, climbed up on top of the tractor's chemical tanks and cut the first wire. Appellee was in a kneeling position and this wire was about in front of his chest. After cutting this wire the

appellee dismounted and wrapped the cut wire around a nearby post at the road. Appellee then moved his tractor 25 or 30 feet and proceeded to attempt to cut the remaining wire while he was kneeling on the tractor's chemical tanks. This uninsulated 7,620 volt wire rendered appellee unconscious and caused bodily injuries. It was necessary to amputate a part of his left arm.

By virtue of a utility easement (the terms of which are not in evidence) the appellant had maintained the power lines for about 20 years. The lines stretched across this field for a distance of about 500 feet from the road to a tenant house. The lines were supported by three poles; namely, one at the road, one in the middle of the field, and one at the tenant house. The lines had been disconnected at the house for approximately two years preceding the incident. The tenant house had not been occupied during that time. About 8 months before the accident appellee's long-time employer had asked the appellant to remove the lines. About 6 months before the accident, following a heavy freeze, the appellant removed the middle pole from the field. As a result, the lines, about two feet apart, sagged to below the 15-foot height required by the National Electrical Safety Code. About three days before the accident, appellee's employer renewed his request to appellant that the unused lines be removed. There was evidence that the lines sagged as low as 8 to 10 feet above the ground. In hot weather (the accident occurred in June) the lines would sag more than in cold weather. Evidence was adduced that appellee's employer had warned all of his employees, including appellee, not to bother the electric lines running across the field and that coworkers also warned appellee on the day of the accident not to cut the wires. Appellee denied that he was warned by anyone that the power lines were energized and, further, that at the time he cut one line and tried to cut the other one his tractor motor was running and he would have been unable to hear any warning from his coworkers in his vicinity. According to him, he did not know the line was energized and there were no signs posted that it was a dangerous line. Appellee knew that the house had been vacant for

two years and it was his belief that the energized line was dead. Appellee's employer, as well as a coworker, testified they believed that since the house had been vacant for two years and the middle or field pole had been removed, that the line was disconnected and abandoned and, therefore, dead. It appears undisputed that one of the two lines was not energized.

There was testimony by a witness who was familiar with the National Electrical Safety Code (in effect in our state by Public Service Commission regulation) that any height below 15 feet is a violation of the code; that a span of wire in excess of 350 feet, which existed after removal of the middle pole, was a violation of safety regulations; and that the failure to maintain the line so as to reduce hazard to life in as far as practicable was also a violation. The appellee also adduced evidence that the appellant had left electricity "in the wires because lots of people were stealing wire up around Forrest City, and that they left a lot of electricity in there to keep them from stealing it." On the day of the accident appellant's employees appeared at the scene and disconnected the energized line at the roadside pole within two or three minutes and removed the wire from the premises.

Upon a motion for a directed verdict it is well settled that the evidence and all reasonable inferences deducible therefrom must be viewed in the light most favorable to the plaintiff and given its highest probative value and then, if there is any substantial evidence tending to establish the issue it must be presented to the jury. *Hardeman* v. *Hass,* 246 Ark. 559, 439 S. W. 2d 281 (1969); *Glidewell* v. *Arkhola Sand & Gravel Co.,* 212 Ark. 838, 208 S. W. 2d 4 (1948); *Wortz* v. *Fort Smith Biscuit Co.,* 105 Ark. 526, 151 S. W. 691 (1912). Furthermore, the issue of negligence is a question for the jury where fair-minded men might honestly differ in their conclusion from the facts in evidence, whether controverted or uncontroverted. *Harkrider* v. *Cox,* 230 Ark. 155, 321 S. W. 2d 226 (1959); *St. Louis, I. M. & S. Ry. Co.* v. *Fuqua,* 114 Ark. 112, 169 S. W. 786 (1914).

We have long recognized the rule that the very nature of the business of an electric company requires it to use a high degree of care in the erection, maintenance, operation, and inspection of its equipment which is used in the transmission of its electric power, so as to prevent injury to one likely to come in contact with the power line. *Arkansas Power & Light Co.* v. *McGowan,* 227 Ark. 55, 296 S. W. 2d 420 (1956). In *Arkansas Power & Light Co.* v. *Cates,* 180 Ark. 1003, 24 S. W. 2d 846 (1930) we recognized that:

> "The duty of an electric company in reference to keeping its appliances in safe condition is a continuing one. Not only must it exercise a high degree of care in the original selection and installation of its electric apparatus, but thereafter it must use commensuate care to keep the same in a proper state of repair. The obligation of repairing defects does not mean merely that the company is required to remedy such defective conditions as are brought to its actual knowledge. The company is required to use active diligence to discover defects in its system. In other words, an electric company is bound to exercise due care in the inspection of its poles, wires, transformers and other appliances."

When we apply these well recognized and long established rules of law, we are of the view that in the case at bar there was a submissible issue for the jury's consideration as to appellant's negligence and, therefore, the court correctly denied appellant's motion for a directed verdict. The questions of contributory negligence and the voluntary act of the appellee were questions of fact for the jury.

Nor can we agree with appellant that appellee was a trespasser. It is true that the appellant possessed a utility easement across the property for the purpose of constructing and maintaining its power line. The limitations of the easement are not before us. There was evidence that the power line was sagging to a height which was far below the recognized national standard for safety which was adopted by a state regulation. The appellee

was a farm laborer who had the legal right to be upon and to cultivate the servient estate. The line sagged so low that it impeded the work being performed by the appellee to the extent he could not drive his tractor underneath the line. It appears that the appellent itself could be invading the rights of the servient estate since the maintenance of the line at this low height was unnecessary for appellant's use of its dominant estate. See *Davis* v. *Arkansas Louisiana Gas Co.*, 248 Ark. 881, 454 S. W. 2d 331 (1970); *Arkansas Louisiana Gas Co.* v. *Maxey*, 245 Ark. 15, 430 S. W. 2d 866 (1968).

We next consider appellant's contention that the court erred in not permitting the jury to consider appellant's affirmative defense that there was an assumption of risk by appellee when he touched the power line. We must agree with appellant. The doctrine of assumption of risk is applicable in cases of ordinary negligence and is not limited to master-servant relationship. *International Harvester Co.* v. *Pike*, 249 Ark. 1026, 466 S. W. 2d 901 (1971); *Bugh* v. *Webb*, 231 Ark. 27, 328 S. W. 2d 379 (1959). In 38 Am. Jur., Negligence § 173, it is said: "The doctrine of assumption of risk in an action between persons not master and servant * * * is confined to cases where the plaintiff not only knew and appreciated the danger, but voluntarily put himself in the way of it."

In the case at bar, as appellant observes, it is true that the appellee entertained the belief that the power line was not energized or he would not have attempted to cut it. Appellee, however, voluntarily came in contact with the sagging line and there was evidence that he was warned to stay away from it. We think it was a fact question as to whether appellee's belief was reasonable in the circumstances and, therefore, the defense of assumption of risk was properly a matter for the jury to consider.

We also agree with appellant that the court erred "in permitting the appellee to ask questions and introduce evidence about other deaths and law suits involving appellant in past years." The appellee was permitted to elicit from appellant's witness that an individual was

killed 11 years previously by coming in contact with a power line when he was riding a combine. The witness replied that he knew of the incident, however, it was not in his territory. The witness further testified that he was not aware of any other accidents like this occurring within his territory. This question was permitted, over appellant's objection, on the basis that the jury could consider it for the purpose of determining punitive damages. Appellee cites to us no authority as to the relevancy or probative value of this testimony. He merely asserts it was admissible to prove punitive damages. In our view this evidence relates to a matter too remote in point of time and from the scene of the accident. Therefore, it is inadmissible and prejudicial.

We are also of the view that it was error for the trial court to submit to the jury the issue of punitive damages. The court instructed the jury that it could impose punitive damages if it found that appellant, "its agents, servants or employees, knew or ought to have known, in light of the surrounding circumstances, that their conduct would naturally or probably result in injury and that they continued such conduct in reckless disregard of the consequences from which malice may be inferred." AMI 2217. Negligence alone, however gross, is insufficient to justify an award for punitive damages. There must be the additional element of wantonness or such a conscious indifference to consequences that malice can be inferred. *St. Louis, I. M. & S. Ry. Co.* v. *McMichael,* 115 Ark. 101, 171 S. W. 115 (1914). In the circumstances, we cannot say there is any substantial evidence that the appellant's conduct was such as would characterize its action as impliedly malicious with respect to foreseeable injuries to appellee.

The appellant also asserts the court erred in not permitting the appellant to ask "leading questions" on cross-examination of a witness and also erred in refusing a mistrial because of comments and interruptions during cross-examination of this 17-year-old witness who observed the occurrence of appellee's injury. During the cross-examination the court instructed appellant's attorney to ask him questions instead of making state-

ments to him. Appellant's attorney contends that he was only asking leading questions which he had the right to do on cross-examination. Ark. Stat. Ann. § 28-705 (Repl. 1962). It was the position of the court that the cross-examiner was making statements rather than asking questions. Even though the cross-examiner has the right to ask leading questions, this does not accord him the right to in effect testify by making statements. In the case at bar, although the issue is close, we observe that the appellant has some merit in its contention. Since this issue is not likely to occur upon a retrial, we deem it unnecessary to discuss it further.

The appellant also asserts that the court erred in permitting the appellee to testify as to his understanding and belief as to whether the power line was energized. Since we hold that the defense of assumption of risk was a submissible issue to the jury, we are of the view that the appellee's understanding and belief were permissible in evidence for the jury's consideration. However, we agree with appellant that it was impermissible for appellee's employer (or appellee's coworker), to testify as to his belief about the power line being energized. Although it was permissible for the employer to testify as to any facts known by him leading up to the occurrence, this knowledge would not permit him to state his belief and opinion.

The appellant also contends that it was error to permit appellee's employer to testify regarding conversations with unnamed truck drivers as agents of appellant. We cannot agree. There was only one power agency, the appellant, which had served this area for many years. The witness was very familiar with appellant's trucks and equipment that served this area. He testified that definitely the unnamed personnel to which he communicated his request to remove the lines were appellant's employees who were operating its equipment. Further, that one of appellant's drivers responded that he had no authority to remove the lines and that he would call the nearby main office. The witness observed and heard this employee relay his request to appellant's main

office by short wave radio. In the circumstances we think this testimony was admissible.

We cannot agree with appellant's contention that it was error to refuse its instruction which defined intervening cause for the jury's consideration. We agree with the trial court's view that there is no evidence "to show that there is any event intervening which was completely independent of the conduct of either party."

Appellant further contends that it was error to permit an expert witness to testify when the facts on which he based his opinion had not been established. The appellant objected on the basis that the hypothetical question did not contain facts that had been established by the evidence. We cannot agree with appellant. In our view the facts presented in the hypothetical question were fairly established by the evidence. Furthermore, if appellant considered there were omissions of fact which were essential to the question propounded, these additional facts could be supplied to the witness on cross-examination. *Shaver* v. *Parsons Feed & Farm Supply, Inc.*, 230 Ark. 357, 322 S. W. 2d 690 (1959).

For the prejudicial errors discussed, the judgment is reversed and the cause remanded.

Reversed and remanded.

FOGLEMAN and BYRD, JJ., dissent in part.

JOHN A. FOGLEMAN, Justice, dissenting in part. I concur in the result reached by the majority holding that there was evidence to pose jury questions as to appellant's negligence and the proximate cause. I would have grave doubt that the actions of Daniel were sufficiently foreseeable to justify a finding of negligence or that his injury or the manner in which it was inflicted was a natural and probable consequence of the omissions of Woodruff, if it were not for the testimony relating to the reasons for not de-energizing the 7620-volt line which was serving no one. Even though its disuse seemed to justify the removal of a supporting pole, there was testi-

mony tending to show that the reason for leaving the line charged was to prevent theft of the wire. Not only was there testimony that officials of appellant had stated that numerous people were stealing wire in its service area, these officials admitted that one of the reasons for leaving unused lines "hot" was to prevent the continual thefts of wire which they had been experiencing. Thus, it seems that appellant might possibly have foreseen the cutting of wire on a line, which might, from appearances, have been taken to be an abandoned line, and that such cutting might be a natural and probable consequence of leaving an inadequately supported line sagging over farmland at a height which would prevent the passage of ordinary farm equipment thereunder.

I do not agree that it must, or can be said, as a matter of law, that appellee was not a trespasser. It seems to me that we could come nearer saying that when he undertook, on his own initiative, to cut and remove appellant's transmission lines, he became a trespasser as a matter of law. Certainly, his right to do so could not be any greater than that of his employer, the owner of the servient estate.

Daniel testified that:

He had seen the line every day before his injury and knew that it had been sagging for better than a year; he pulled up beside the line and decided he would cut it; he stopped his tractor, went to his tool box, got his pliers, drove his tractor under the lower of two wires, got on the chemical tank on the tractor on his hands and knees and cut this wire, which was then about the level of his chest, then got off the tractor and wrapped this wire around a post; he got back on his tractor and moved it 25 to 50 feet in order to place it under the second wire which was about two feet higher[1] than the one he had first cut, again knelt on the tractor just as he had done when he cut the lower wire, reached up with his

[1]There was also testimony that this wire may have been three feet higher than the other, and testimony that it was more than 13 feet above the ground.

left hand and grasped the wire and received the shock and injury of which he complains.

The tractor was an 806 International, with 100-gallon tanks for chemicals on the fenders. There was testimony that the tractor was six feet high and that the top of the tanks was about two feet higher, and that Daniel, kneeling, rose some three feet above the level of the top of the tank.

Although we do not know the exact terms of the easement involved, it is stipulated that appellant had been granted a right-of-way for the construction of an electric distribution line across the employer's land in order to serve a house, also on his land. In the absence of any showing of a limitation on that easement, appellant as the owner of the dominant estate had the right to use it to the extent necessary for the erection, operation and maintenance of the line, and the landowner as the holder of the servient estate retained the right to exercise all rights of ownership not inconsistent therewith. Neither has the right to use the right-of-way in a manner that will interfere with the use and enjoyment thereof by the other. *Davis* v. *Arkansas Louisiana Gas Co.,* 248 Ark. 881, 454 S. W. 2d 331. The landowner must not interfere with the property of the utility to whom the easement is granted. *Patterson Orchard Co.* v. *Southwest Arkansas U. Corp.,* 179 Ark. 1029, 18 S. W. 2d 1028, 65 A. L. R. 2d 1446; *Drainage District No. 16* v. *Holly,* 213 Ark. 889, 214 S. W. 2d 224.

The unlawful and intentional injury of a wire, line or other apparatus belonging to a firm or corporation engaged in the sale of electricity is a misdemeanor punishable by fine or imprisonment or both. Ark. Stat. Ann. § 41-4236 (Repl. 1964). This, of course, is a form of trespass. See *Miller* v. *State,* 190 Ark. 362, 159 S. W. 1125. Even if Daniel originally entered upon appellant's right-of-way with the most innocent intentions, his subsequent action in cutting or attempting to cut the wires was nonetheless a trespass, if unwarranted or illegal un-

der the circumstances, and as to those actions he was probably a trespasser. *Ballard* v. *Noaks,* 2 Ark. 45. The subject is given excellent coverage in Restatement, Torts, Second 407, § 214. There we find:

### Liability for Excess; Trespass ab Initio

(1)  An Actor who has in an unreasonable manner exercised any privilege to enter land is subject to liability for any harm to a legally protected interest of another caused by such unreasonable conduct.

(2)  One who properly enters land in the exercise of any privilege to do so, and thereafter commits an act which is tortious, is subject to liability only for such tortious act, and does not become liable for his original lawful entry, or for his lawful acts on the land prior to the tortious conduct.

Comment on Subsection (1):

a.  A privilege to enter land may be unreasonably exercised either by the intentional doing of an act which a reasonable man would not regard as necessary to effectuate the purposes for which the privilege is exercised. Subsection (1), therefore, applies not only where the actor deliberately abuses his privilege by doing an act which he recognizes as unnecessary or deliberately does an act which a reasonable man would so recognize, but also where the actor does not use reasonable care to prevent the exercise of his privilege from involving an unreasonable risk of harm to the legally protected interests of others.

b.  In the vast majority of cases the intentional or negligent misconduct of the actor in the exercise of his privilege is of such a character as to be intended to harm or likely to harm the land itself or persons or chattels upon it. However there may be cases in which the actor's unreasonable exercise of his privilege involves a recognizable and unreasonable risk, or even a certainty, of harm to persons or

things outside the land, in which case the statement in this Subsection subjects the actor to liability to such persons for harm resulting to them.

c. As to the effect of serious affirmative misconduct on the part of the actor upon his liability for his original entry on the land, see Subsection (2).

\* \* \*

Comment on Subsection (2):

\* \* \*

(f) In any case where the lawful entry upon land is used as a cover or cloak for the subsequent misconduct, and the entry is for the purpose of taking advantage of the privilege conferred by authority of law in order to commit another tort, the actor remains liable under Subsection (1) of this Section. The subsequent misconduct is always to be considered as evidence bearing on the original intent.

To say the least, there is certainly substantial evidence upon which a jury could have found that Daniel was a trespasser.

If there is indeed a jury question as to foreseeability in determining whether appellant was negligent and a question as to proximate cause if appellant was negligent, then I do not see why there is not also a jury question on appellee's entitlement to punitive damages. There can be no doubt that appellant knew that its 7620-volt distribution line passed directly over agricultural lands being cultivated by the use of power-driven equipment. It knew that the line had served no one for two years. It removed a supporting pole at the middle of the span leading to the house formerly served, approximately one year prior to Daniel's injury. It knew that the line would sag. There is evidence from which the jury might find that removal of the line had been requested by the landowner and that the line was interfering with farming operations. Appellant had a duty to

exercise a high degree of care to inspect and maintain its line in proper condition to prevent injury to one likely to come in contact with it. Yet, it cannot be doubted that the line did sag below the height prescribed by safety standards, and appellant certainly knew that the sag would be greater in the summer than in the winter.[2] Even though appellant claims it was short of money which could be used to remove abandoned lines, the removal was a rather simple operation after Daniel was injured. When consideration is given to the testimony as to appellant's purpose in leaving the line charged, it seems that if the jury should find the requisite foreseeability on which to base a finding of negligence, that this negligence was a proximate cause of his injury and that Daniel did not voluntarily assume the risk, then the test for evidence to support an award of punitive damages has been met. If appellant should have known that its conduct would probably result in injury and continued that conduct in a conscious indifference to consequences from which malice may be inferred, then the jury might properly award punitive damages. *McGlone* v. *Stokes*, 193 Ark. 1008, 104 S. W. 2d 191. In *Texarkana Gas & Electric Co.* v. *Orr*, 59 Ark. 215, 27 S. W. 66, it was held that there was substantial evidence to support an award of punitive damages. The evidence showed these facts:

> During the night there was a severe electrical storm causing some of the electric company's wires to break at about 2:00 a.m. It was discovered at the power house that there was a "ground" or connection between the power line and the earth, either by direct contact of a broken line, or by the line or broken ends of it coming in contact with a tree, with the pole or roof of a house, or a string, wire or rope resting on the earth thrown over the line. It was scarcely possible to locate the "ground" by tests, and the weather was such that it may not have been reasonable to expect the company employees to search for the broken wires until daylight. As soon as the "ground" was disclosed at the power

---

[2]The injury occurred June 4, 1968.

house, an employee of the company awakened and advised the superintendent, who sent word to the engineer in charge of the plant to "go ahead." The deceased for whose estate the suit was brought took hold of a wire that ran to a saloon and was warned to be careful. The wire turned out to be dead. This was after daylight and after people had begun to appear on the city streets. The deceased was in position to have seen a hog receive a shock from live wires on the other side of the street. While crossing the street, he picked up a broken wire that ran into the saloon and dragged it toward a drug store across the street. In obedience to an order by a policeman to put down the wire, the deceased threw it. He received a fatal shock as he did so, apparently as a result of this dead wire coming into contact with a live one.

If there was sufficient evidence to support an award of punitive damages in that case, then the jury should have had the discretion to award them here.

I am also of the opinion that there was error in the denial of appellant's requested instruction no. 17, AMI 503, telling the jury that if any event occurred following an act or omission on the part of a party completely independent of that party's conduct, the original act or omission is not a proximate cause. The circuit judge denied this instruction, stating that appellee alleged that there was negligence on the part of appellant and appellant alleged negligence on the part of appellee, and if there was negligence on the part of appellant, there could be no independent intervening cause. I submit that this ruling was erroneous.

Apparently, the trial judge felt that if appellant were guilty of negligence, the acts of appellee could constitute contributory negligence, but not an inervening cause. Our cases hold to the contrary. *Arkansas Valley Trust Co.* v. *McIlroy*, 97 Ark. 160, 133 S. W. 816, 31 L. R. A. (n. s.) 1020; *Hayes* v. *Missouri Pacific Ry. Co.*, 208 Ark. 370, 186 S. W. 2d 780. In the *McIlroy* case we held that the acts of a plaintiff who, in igniting a

piece of paper at a smoldering fire with which she attempted to start a new fire, set fire to her own clothes constituted an efficient intervening cause of her injury which prevented recovery from the defendant, even if it was negligent in starting the original fire, or in leaving it unguarded. The acts of the plaintiff were said to make the setting of the fire too remote to be the cause. We said that the jury should have been instructed that such conduct on the part of the plaintiff would bar her recovery.

In *Hayes,* we held that the chain of causation between negligence and injury is broken when an independent act of a plaintiff, not within reasonable contemplation of defendant, intervenes to bring about injury. Our holdings are based upon the principle that the consequence of the original negligent act must be within the range of probability as viewed by the ordinary man, so that consequences which are merely possible cannot be regarded as either probable or natural and cannot be a proximate cause. In *Hayes,* a railroad track laborer attempted, without being instructed to do so, to extinguish a fire on the railroad right-of-way while his clothing was saturated with creosote from his finishing rails and angle bars. A directed verdict was sustained, not because the laborer was held to be guilty of negligence as a matter of law, but because his injury was not one which was the natural and probable consequence of the fire being set or foreseeable by the railroad, in the light of the existing circumstances.

In another case involving the setting of a fire by a locomotive, we held that one who sustained personal injuries in fighting the fire in a burning pasture was not entitled to recover for them. *Missouri Pacific Railroad Co. v. Benham,* 192 Ark. 35, 89 S. W. 2d 928. There we said:

> Plaintiff suggested and adopted his own method of fighting the fire, and proceeded with its execution according to his own judgment, without dictation or interference by any of defendant's em-

ployees. Defendant made no contention that the fire was not occasioned by sparks from its passing locomotive, and there was no proof made as to the fire escaping from the locomotive because of any negligence on the part of defendant, as it was liable for any damage by fire caused by the locomotive because of section 8569, Crawford & Moses' Dig., whether the fire was occasioned with or without negligence. If, however, it may be assumed that some negligent act or omission on the part of defendant resulted in setting out the fire, nevertheless there is no liability for the physical injuries plaintiff has suffered. It is well settled that, before liability can attach to anyone for a negligent act, it must be the proximate cause of the resulting injury and one which, in the light of attendant circumstances, a person of ordinary foresight and prudence could have anticipated. *St. Louis, I. M. & So. Ry. Co.* v. *Bragg,* 69 Ark. 402, 64 S. W. 226, 86 Am. St. Rep. 206; *Arkansas Valley Trust Co.* v. *McIlroy,* 97 Ark. 160, 133 S. W. 816, 31 L. R. A., N. S., 1020. It was the duty of plaintiff to use reasonable efforts to himself extinguish the fire and thus minimize his damage; if, in doing so, he was intemperate and injury to himself occurred, it was his own fault and a consequence which could not have been reasonably foreseen from the negligent act, if any, of the defendant in allowing fire to escape from its locomotive. In other words, it was his own act which was the active intervening cause directly producing the injury and not the original alleged negligent act of defendant.

Even if it could be said that appellant was guilty of negligence as a matter of law, this does not mean that its negligence was the proximate cause of appellee's injury. It may well be that a jury would find that appellee's action in cutting the wires was an intervening act not the natural and probable consequence of any act or omission on appellant's part. If so, appellee's acts constituted an independent efficient intervening cause, even though appellant may have been guilty of negligence.

The evidence in this case would constitute very

substantial evidence in support of such a finding. W. H. Gerrard testified that on the morning of the occurrence he told Daniel to leave the lines alone, and to go down beside the wires rather than under them. He said that he told Daniel and all his other employees not to bother the lines. Dan Johnson, Daniel's immediate boss and field foreman for Gerrard, was present at all times when Daniel was operating the tractor on the day of his injury. Johnson testified that the tractor drivers had been told on the day of Daniel's injury to turn when they came to the line. He said that the tractor equipped with the tanks would not pass under the line, which he said was 12 or 13 feet above the ground. Johnson stated that he had warned Daniel about the line on the day before, that he had told Daniel and all other tractor drivers to stay away from the line on the morning before the incident, that he warned Daniel at the time he cut the first line and told him not to cut the second line. Johnson said that he had told the drivers to work up to the line and turn around. He also testified that all the drivers had done this prior to Daniel's injury. Johnson testified that he knew what Daniel was going to do when he got the pliers out of his tool box, so he told him not to cut the line. After appellee cut the lower line and moved the tractor into position under the higher one, Johnson said that he hollered to Daniel, "You want me to call Lacey Funeral Home?" and that another tractor driver hollered to Daniel, "What do you want me to tell Chi?"[3] This driver and Bill Gerrard, son of Daniel's employer, corroborated Johnson's testimony about this remark. Bill Gerrard also heard Johnson call out when Daniel was about to cut the first wire, "Don't cut it, it's hot." This witness heard Johnson warn Daniel twice.

I do not see how it could be seriously urged that appellant was not entitled to this instruction.

In all other respects I agree with the majority opinion.

---

[3]Chi was appellee's wife.