HARRIS *v.* HUNT.

4-9021                                      225 S. W. 2d 15

Opinion delivered December 12, 1949.

*Surrey E. Gilliam,* for appellant.

*Claude E. Love,* for appellee.

HOLT, J. Appellee, Hunt, brought this suit against appellants to recover $944.94 which he had paid, on the purchase price of $2,544.94, on a new Reo truck. His complaint alleged that the "truck was guaranteed by the defendants to give satisfactory service in hauling logs, which the defendants knew the truck would be used for, and for which use the defendants added special equipment and guaranteed the truck to do the job, and the truck being new, also carried the standard warranty against defects in workmanship or material, which warranty was in effect etc.," that the truck was "built of such faulty and inferior material and of such faulty workmanship as to be worthless to plaintiff," . . . that he complained to defendants, that they made several efforts to put the truck in condition to do the work

but were unable to do so, and that he returned the truck and demanded that his money be refunded.

Appellants' answer was a general denial and by way of cross complaint sought to recover from appellee on an open account $270.22.

A jury awarded appellee $771.15, and awarded $147.48 to appellants on their cross complaint, whereupon the trial court, after deducting the $147.48, allowed appellants, entered a judgment for $623.67 in favor of appellee. This appeal is from that judgment. There was no cross appeal.

The action was based on an alleged express warranty that the truck in question would perform satisfactorily and "do the job" for which it was purchased, and that it was suited for the purpose and use of hauling logs. Hunt was at the time engaged in the saw mill business.

The following factory warranty was given appellant when the truck was delivered to him: "PARTS AND LABOR WARRANTY—There will be no charge for parts deemed defective by the Manufacturer during the first 4000 miles of operation, or during the first ninety (90) days after delivery—whichever shall first occur. There will be no charge for labor in replacing such defective parts during this period."

Hunt testified: "Well, I came by their place one afternoon, and I got to talking with Mr. Harris; and I had just bought a Studebaker truck a few days before that. While I was talking to him he got after me to sell me a Reo truck; and he said it would out-perform my Studebaker truck; and he told me what it would do, about the specifications of the truck, and how strong it was made, and what a motor it had in it. And I turned to go out on the street, and he said it had a Red Seal Continental motor in the truck; and I knew enough about that motor, that they were supposed to be a good unit. And we talked on; and I told him I could use another truck in my business, if it would do the job; and I told him: 'don't sell me something that will not work; I have to

have something to work with to make the payments on it.' . And he guaranteed it would do the job. .˙ . .

"Yes, sir; they told me that they would guarantee me it would do more than the Studebaker ever did—all of the salesmen talk that way—that is all right; that is supposed to be salesmanship. I didn't particularly go for that. He was going to make it do more than the Studebaker, and I knew what the Studebaker would do. He told me it had a Red Seal Continental motor in it, and it was heavier than the Studebaker, but I found out later there was no Red Seal motor in it. . . .

"And I told him the truck wouldn't work, I could not make any money out of it, and it wouldn't work; every day I started out with it, it had failed to do the job. . . . Q. Within the ninety (90) day period from the time you bought the truck you refused to take it back —to take the truck back, unless they would put in a new motor? A. I didn't say anything about a new motor; I said I wouldn't take the truck as it was. Q. You said you wanted a new motor? A. I said a new truck, not a new motor. Q. You turned down the whole truck? A. I was turning back the whole truck, and all my notes were paid up. They wanted to deliver the truck back to me and I refused it."

Appellants had a factory man come from Little Rock to work on the truck and he put in a new timer chain.

Hunt further testified that he took the truck to the woods the following day after its purchase and "loaded it up and when we started out, I know we didn't have on a big load,—but the truck could not get away. . . . I kept on trying the truck on smaller loads, thinking maybe it would get to working and do better, and pull out, but it never would."

Appellants' mechanic who had worked on the truck in question testified that due to its long wheel base it was not suited for hauling logs. Another witness testified that he had had seven years driving trucks, in hauling logs, and worked for appellee, Hunt. He was the

first to drive the Reo truck and drove it about a week and a half, that he could not pull six or seven hundred feet of logs on it—the springs would not support the load, and he quit the job because he could not operate this truck.

B. J. Brown testified that he next drove the truck and when he put 800 feet of logs on it, the body dropped down on the drive shaft and the truck would not move, and that even with a lighter load the springs dropped down until the cross beam almost cut the drive shaft in two.

Another witness testified that 2,800 feet of oak lumber (which was a small load) was placed on the truck and it wouldn't pull and that they had to push it to get it started.

We do not attempt to detail all the testimony. We think what we have set out above was substantial, and sufficient to warrant the jury in finding that the truck would not perform, or do the work in accordance with the representations of appellants which, in the circumstances, amounted to an express warranty.

"To constitute an express warranty it is not necessary that the word 'warrant' be used, but may be based on the statements of the seller as to the quality or condition of the chattel he is selling. . . . The court then quoted with approval from 24 R. C. L. (Sales) § 437, as follows: 'To constitute an express warranty the term "warrant" need not be used; no technical set of words are required, and it may be inferred from the affirmation of a fact which induces the purchase and on which the buyer relies and on which the seller intended that he should do so, but it has been said that the words used must be tantamount to a warranty, and not dubious or equivocal.'" *Ives* v. *Anderson Engine & Foundry Company*, 173 Ark. 112, 292 S. W. 111.

Appellants earnestly argue, however, that there was error in the court's giving the following instruction over their objections and exceptions: "You are instructed that if you find from a preponderance of the

testimony, that the defendants or their authorized agents guaranteed to plaintiff, that the motor in the truck in question, would be a Continental Red Seal Motor, when in fact the truck was delivered with a Reo Gold Crown Motor, and if you further find such motor was substantially inferior to the motor contracted for, and you further find that because of such variance plaintiff returned the truck and rescinded the contract, then your verdict will be for the plaintiff.''

We think this contention must be sustained.

It will be observed that this instruction submits to the jury the question whether the Reo Gold Crown Motor with which the new truck was equipped ''was substantially inferior to the motor contracted for,''—that is a Continental Red Seal Motor.

We find no allegation in appellee's complaint that the truck in question was equipped, or was to be equipped, with a Red Seal Continental Motor, nor do we find any evidence in this record to the effect that the Reo Gold Crown Motor with which the truck was equipped, was inferior to a Red Seal Continental Motor.

This instruction was, therefore, prejudicial to appellants and there was error in giving it.

Accordingly, the judgment is reversed and the cause remanded.

McFADDIN, J., not participating.