LINDY GRAMLING *v.* HENRY BALTZ, D/B/A
LAWRENCE COUNTY EQUIPMENT COMPANY
& INTERNATIONAL HARVESTER COMPANY,
A FOREIGN CORPORATION

5-5905                                         485 S.W. 2d 183

Opinion delivered June 26, 1972

[Supplemental Opinion on Denial of Rehearing delivered
October 23, 1972.]

*Kirsch, Cathey, Brown & Goodwin,* and *John Watkins,* for appellant.

*John C. Calhoun* and *Owens, McHaney & McHaney,* for appellees.

FRANK HOLT, Justice. This is a suit by appellant, a buyer, to recover damages from appellee-Baltz, the seller, and appellee-International Harvester Co., the manufacturer of a truck. The appellant alleged a breach of express warranty and, also, a breach of an implied warranty of merchantability and fitness of the truck for a particular purpose. At the conclusion of appellant's case, the court found that appellant had failed to proffer substantial evidence to support his allegations and directed a verdict against him. For reversal, appellant first contends that the court erred in directing a verdict for the appellees.

According to appellant, he had been in the trucking business since 1965 and in July, 1966, he purchased a truck from appellees to use in his commercial hauling business. In January of 1969 he needed a new truck and talked with Baltz three times in a ten day period about trading trucks. Thereafter, appellant purchased from Baltz a 2010A, single-wheel axle truck with a 478 engine manufactured by International. This truck's engine was larger and the axle's transmission heavier than those in the truck previously purchased from Baltz. The list price of the new truck was $11,500. Baltz deducted $1,000 from the list price and then accepted appellant's old truck as a trade-in which resulted in a balance of $8,900 on the purchase price. The appellant expected more speed from the larger and heavier transmission. Baltz informed him this truck would move faster than his other truck. Appellant went to the appellee's place of business on January 20, 1969, and took possession of the truck. It appears that about two or three weeks later, the necessary papers in the transaction were signed by the

parties, at which time Baltz gave appellant the title and a Five Star Warranty.

During appellant's first trip with the truck, he noticed that it was geared too fast and wouldn't "pull" properly. Two days later, he took the truck to the equipment company and complained to Baltz. A few days later, Baltz told appellant to take the truck to the International garage in Memphis. Upon arrival at this garage, he learned that the gear needed replacing; however, the necessary parts were unavailable and he had to leave the truck for three weeks for the necessary repairs. Approximately two months from that date, appellant again experienced difficulty with the truck. Appellant stopped in Louisiana at an International garage and explained that the clutch was slipping. That garage agreed to repair the truck at appellant's expense. He refused and went to Michigan where he unloaded and then took the truck to an International garage there. They checked the oil leaks in the fuel system and adjusted the clutch and offered to further repair the truck if appellant would stay overnight. He refused and returned home with an empty truck, because the truck lacked the power to pull a load. Upon his return, he took the truck to Baltz and explained that the truck "wouldn't pull." He left the truck with Baltz for repairs from April 26, 1969, until June 7, 1969. The excuse for this long delay was that parts were unavailable.

Upon receipt of the repaired truck, appellant again used it for hauling purposes, and it did not function properly. On the following Monday, the truck was returned to Baltz. After a thirty-day delay because of unavailable parts, the truck was returned to appellant and again it did not "pull" properly. It "ran good" at night, but during the daytime "it just wouldn't pull." It would lose fifteen or twenty miles an hour in speed during "hot weather." He testified that the top speed is sixty-two miles an hour in high gear. During the daytime he never used top gear. He would stay about forty to fifty miles an hour. The truck was supposed to run at top speed even when loaded. The truck was returned to Baltz during July, August, and September. The garage personnel tuned the engine and worked with the carburetor.

In September appellant, as directed, took the truck to the International Garage in Memphis. He picked it up a week later and was told the carburetor had been put together wrong and that it was now corrected. The truck ran "pretty good" during short hauls until the following April, 1970, when the weather began to get hot. The truck "started right back doing the same thing it was doing all the time," overheating with a sudden loss of power. In the meantime, appellant had hired an experienced driver who testified that he had the same difficulty with the truck's lack of power. He left his job because the truck was "independable," and he needed steady employment. The garage in Memphis referred appellant to a garage in Jonesboro. Appellant took the truck there for repairs. Afterwards, the truck "was worse than it had ever been." Appellant complained to the Memphis garage and again took the truck there in August, 1970. The following day he returned the truck as directed to the Jonesboro garage. Soon after he arrived, the truck caught on fire and was damaged. The truck was repaired and no damages as a result of the fire are sought in this law suit.

After repairs, the truck started "missing" again the first time it was used. After stopping briefly at the Jonesboro garage, he then continued the trip, or haul, during which the truck "went to missing just like it done all through the hot summer months." Upon his return he called the garage in Jonesboro and the foreman told him, "[D]on't bring it back to me, I have done all I can. I can't fix it." Appellant was instructed by the International garage in Memphis to return the truck there where repairs were again made. Appellant drove from there to Alabama before the truck quit "pulling." Upon his return to Memphis, he again stopped at the International garage and was told that the points and plugs were wrong. This was repaired with the assurance the truck would perform properly. Appellant had trouble, however, before he reached Jonesboro. After an attempted haul to Chicago, he returned the truck to the garage in Memphis, as directed by the garage foreman. En route the truck completely stopped. After about 30 minutes, the truck was started again and appellant reached Memphis

after stopping to let the truck "cool off." In Memphis the truck was test driven the next day, and appellant was informed that it functioned properly.

Appellant left for Jonesboro and had "trouble" before he reached that destination. He went to the Jonesboro garage and took the shop foreman for a drive. The truck would not pull except in low gear. The foreman then contacted the Memphis garage, and appellant was advised to take the truck back to Memphis. Appellant did not go to Memphis that day. A representative from that International garage came to Paragould and rode with appellant on a 150 mile trip. The truck drove "pretty good that day." This representative did some work on the truck and appellant's driver left with a load for Chicago. The truck did not operate properly, and he was unable to complete the trip. Appellant was again told by the Memphis shop foreman to return the truck. On the way to Memphis it became necessary to have the truck pulled into the garage there. The truck was barely out of the two-year warranty since this was now March, 1971. The estimate for repairs was $1,200 to $1,400. Appellant agreed to pay for the repairs. A couple of days later, however, appellant was notified that the "block was busted" and repairs would cost $2,700. Thereupon, appellant refused to pay the repair costs.

The foreman of International's Jonesboro garage, an independent corporation, testified concerning repairs made to appellant's truck. He testified that appellant had complained about the "lack of power." and he "couldn't get any R.P.M. out of it." Further, appellant usually drove 200 to 250 miles before the problem commenced. He further testified that he had accompanied the appellant in his truck on one occasion when the truck suffered a loss of power and appellant had to run the truck for 2 or 2 1/2 miles in low gear. Upon their return, he told appellant that he would rather not work on the truck. He felt that the Memphis International garage was better equipped to handle the "loss of power" problem.

A former mechanic for the International garage in Jonesboro testified to having worked on the truck. He stated that he never got the truck to "run" to suit him. However, he lacked the equipment necessary to determine if the truck was running full power. From his long experience with this type engine, he assumed that the problem was caused by heat from the oil lifter breaking down on the machine. This situation would cause the block to form a "sand hole" and the lifter would not lift properly. A tune-up would not remedy the problem. He did not make any attempt to repair this since he was not directed to do so. In his opinion it would have required a new block to make the truck perform "properly" and as "rated."

Appellees' evidence was to the effect that any defect in the truck resulted from the appellant's improper maintenance and operation, thus, constutiting a waiver of any warranty; further that appellant had operated the truck in excess of 115,000 miles during more than the two-year warranty without rejection or revocation of acceptance. Therefore, appellees assert that the appellant is estopped to claim either direct or consequential damages as a result of breach of warranty.

On appeal from a directed verdict, we must view the evidence in the light most favorable to the appellant, regardless of credibility in determining if a fact question exists for a jury's consideration. *Haralson* v. *Atlas Transit Co., Inc.*, 250 Ark. 242, 465 S.W. 2d 108 (1971), and *Ives* v. *Anderson Engine & Foundry Co.*, 173 Ark. 112, 292 S.W. 111, (1927). The Uniform Commercial Code § 85-2-601 provides that a buyer may accept or reject nonconforming goods. After delivery rejection must be made within a reasonable time, § 85-2-602. However, § 85-2-608 enables a buyer to revoke his acceptance when such acceptance was based upon a seller's assurances that any nonconformity would be seasonably cured. However, Comment 4 states "the reasonable time period should extend in most cases beyond the time in which notification of breach must be given,***." Comment 3 states:

" 'Assurances' by the seller under paragraph (b) of subsection (1) can rest as well in the circumstances or in the contract as in explicit language used at the time of delivery. The reason for recognizing such assurances is that they induce the buyer to delay discovery."

We cannot say as a matter of law, in the case at bar, that appellees' actions and repeated attempts to make repairs did not induce appellant to retain the truck or prevent him from seeking independent advice from a mechanic of his own choice to determine the cause of the truck's mechanical failure. A waiver does not necessarily result when a buyer continues to use an article following repairs by the seller. *Loe* v. *McHargue,* 239 Ark. 793, 394 S.W. 2d 475 (1965). The record is replete with appellant's testimony, corroborated by disinterested witnesses, which tends to establish a factual issue that the truck was nonconforming from a latent defect and the appellant seasonably relied on appellees' actions or assurances to the effect that the truck was repairable. One witness, a mechanic with 20 years experience, expressed the opinion that a new block was necessary to correct the malfunctioning truck. In the circumstances, we hold that there is sufficient evidence, when viewed most favorably to appellant, to constitute factual issues for the jury. *Harris* v. *Hunt,* 216 Ark. 300, 225 S.W. 2d 15 (1949).

The facts in the case at bar are distinguishable from those in *Ingle* v. *Marked Tree Equipment Co.,* 244 Ark. 1166, 428 S.W. 2d 286 (1968) relied upon by appellees. There the seller made no assertion either by word or action which could reasonably be construed as a promise by the seller to alter the wheels on the combine machine to meet appellant's complaints. In fact, the buyer kept and used the combine after being told it could not be corrected as requested by the buyer. In the case at bar, repeated efforts were made by appellees to repair appellant's truck over a two-year period in attempting to make the truck a conforming delivery or sale.

The appellant, also, asserts for reversal that the court erred in refusing to admit his testimony concerning

consequential damages. The trial court was of the view that the asserted consequential damages, in the nature of the loss of commercial profits, are not recoverable because of the express contractual limitation in the exclusionary clause. A limitation of remedies to prohibit commercial losses is permissible by U.C.C., Ark. Stat. Ann. § 85-2-719 (3) (1961). See, also, *Ford Motor Co.* v. *Tritt, Admx.*, 244 Ark. 883, 430 S.W. 2d 778 (1968). In the case at bar, it is appellant's position, however, that the exclusionary language is not sufficiently conspicuous to preclude consequential damages, citing *International Harvester Co.* v. *Pike,* 249 Ark. 1026, 466 S.W. 2d 901 (1971); *Marion Power Shovel Co.* v. *Huntsman,* 246 Ark. 152, 437 S.W. 2d 784 (1969); *Mack Trucks* v. *Jet Asphalt,* et al, 246 Ark. 101, 437 S.W. 2d 459 (1969).

In the case at bar, the appellant proffered proof of loss of commercial profits or consequential damages based upon the express terms of the written warranty and, also, the implied warranties of merchantability and fitness for a particular purpose. The exhibit reflects that the exclusionary language in the written warranty substantially duplicates the wording and exactly duplicates the size print that was reproduced in *International Harvester Co.* v. *Pike, supra.* In that case we said that the provision was inconspicuous as a matter of law and determined that the issue of implied warranty of merchantability was properly submitted to the jury where the disclaimer provision could not be classified as being conspicuous. In *Marion Power Shovel Co.* v. *Huntsman, supra,* we held that the limitation provision of the written warranty was inconspicuous and said:

> "They [consequential damages] may be allowable if the contractor, at the time of the sale, had reason to know of a general or particular requirement of the buyer, and if the failure of the merchandise to produce those requirements could not reasonably be prevented by cover or otherwise."

See, also, § 85-1-201 (10) (Add. 1961).

In the case at bar the inconspicuous written limita-

tion is unenforceable as a matter of law. This being true it follows that this exclusionary provision cannot be invoked to prevent appellant from asserting and adducing competent evidence as to his consequential damages. The appellant proffered proof that he purchased this truck for a particular purpose; that he attempted to minimize his damages by asking appellee for a substitute truck; that he always had commercial loads available and had a lease contract during the time the truck was "down" or disabled due to the alleged malfunctioning or non-conformity. The appellant offered proof to establish loss of profits by using his business records as a guide. He computed the loss by multiplying the number of days that the truck was malfunctioning or "down" by the daily net income average based upon the dates when the truck was in operation. We think this is competent evidence. Even if this type of evidence would not ordinarily be admissible because of speculation and conjecture, we are of the view that under the provisions of our U.C.C. it should be considered by the jury. The admissibility of evidence in this situation should be liberally construed. See Ark. Stat. Ann. 85-2-715 (Add. 1961), committee comment 4. Of course, the burden is upon appellant to show the existence and breach of any implied warranty and that the breach of its terms was the proximate cause of the asserted consequential damages. § 85-2-314, committee comment 13.

Since a factual issue as to direct and consequential damages existed, the judgment is accordingly reversed and the cause remanded.

Reversed and remanded.